639 So.2d 312 (1994)
STATE of Louisiana
v.
Jean BRUMFIELD.
No. 93-KA-2404.
Court of Appeal of Louisiana, Fourth Circuit.
June 15, 1994.
*313 Anne Turissini, Orleans Indigent Defender Program, New Orleans, for defendant-appellant Jean Brumfield.
Harry F. Connick, Dist. Atty., Val M. Solino, Asst. Dist. Atty., New Orleans, for plaintiff-appellee State.
Before KLEES, JONES and WALTZER, JJ.
KLEES, Judge.
The appellant was indicted on April 1, 1993, on one count of second degree murder. On August 24, 1993, a jury found relator guilty as charged of second degree murder. The trial court on August 31, 1993, denied a defense "Motion for Judgment of Acquittal or in the Alternative for Modification of Verdict." After waiving all delays, relator was then sentenced to life imprisonment, without benefit of parole, probation or suspension of sentence. This appeal followed.
Gwendolyn Taylor testified that she and the appellant had been living together for some time prior to their break-up in June of 1992. Ms. Taylor had a seven-year-old daughter by the appellant and one other child. The separation was not amicable; Ms. Taylor described it as "bad." Ms. Taylor began to date another man, Nathaniel Montegut, *314 the victim in this case. Montegut had moved into Ms. Taylor's Clio Street apartment during the summer. Ms. Taylor and Montegut were planning to move to California, along with Ms. Taylor's two children. A friend of Ms. Taylor, Crystal Turner, had recently moved into the apartment along with her three children.
Ms. Taylor testified that she, Montegut, Crystal Turner and John McGee were playing cards in the front room of Ms. Taylor's apartment on the evening of August 23, 1992, a Sunday. Montegut was closest to the front door, which was open because of the heat. Ms. Taylor saw the appellant come through the open door and told Montegut to watch out. She then saw the appellant raise his arm and stab Montegut in the back with what appeared to be a kitchen knife. Montegut fell to the floor while the appellant continued to stab him. Montegut managed to leave the apartment through a kitchen door. Ms. Taylor followed him as he walked to his mother's nearby apartment. There, Montegut entered the apartment and collapsed across a bed. An ambulance was summoned; Montegut was declared dead at the hospital.
Ms. Taylor identified the appellant as the man who had stabbed Montegut. She stated that she had talked with the appellant on the preceding Thursday or Friday. At that time, the appellant asked her whether she would turn him in if he killed Montegut. On the other hand, she admitted that, some two or three weeks earlier, Montegut had told the appellant's mother that he (Montegut) would kill the appellant. Ms. Taylor explained that the threat was occasioned by the appellant's "jumping" her; she described the appellant as physically and sexually abusive toward her. However, she indicated that she did not believe Montegut would have carried out his threat.
Ms. Taylor denied speaking with the appellant at any time that day. Ms. Taylor also testified that she later checked to see if any of her kitchen knives were missing because she thought she had recognized the knife the appellant had wielded. However, she found none of her knives missing.
Crystal Turner corroborated Ms. Taylor's account of the incident. She testified that around 10:00 p.m. that evening, the four adults were playing cards in the front room with the door open. She stated that Montegut had his back to the door. She saw the appellant come in through the door without saying anything. Although she did not see a knife at first, she saw it when the appellant raised his arm and stabbed Montegut in the back. At this point, everyone started screaming. Montegut fell on the floor while the appellant continued to stab him. Ms. Turner stated that when she ran into the kitchen, Montegut passed by her on his way out the kitchen door. They followed Montegut to his mother's house and found him lying across a bed.
John McGee also corroborated Ms. Taylor's and Ms. Turner's testimony. He testified that he had been sitting next to Montegut on a sofa by the open door when the appellant entered the apartment, at a "gallop" and with a knife raised in his right hand, and proceeded to stab Montegut in the back. McGee described the weapon as "a big old butcher knife." He stated that although Montegut stood up after being stabbed in the back, he sat back down and the appellant continued to try to cut him. McGee described everyone as hysterical. When McGee stood up, the appellant left the apartment. McGee stated that he and the women followed Montegut to his mother's apartment.
The cause of death was a stab wound to the back; five other stab wounds to the legs and arms were superficial. The appellant was arrested some six months after the incident.
The appellant's mother testified for the defense. She, too, characterized her son's break-up with Ms. Taylor as "bad." She related that during the month of July, she received a telephone call from Ms. Taylor's boyfriend. The caller threatened to have her son killed if he did not leave Ms. Taylor alone.
The appellant testified on his own behalf. He admitted to stabbing Montegut in the back, but characterized it as a "fight stabbing." He stated that he knew that Montegut had threatened him; his mother had told *315 him about the call and other people had told him about Montegut's threat. He explained that although he knew of the threat, he had gone to Ms. Taylor's apartment to visit with his daughter. Though he usually met his daughter when she visited her grandmother's house, he had not seen the child lately.
The appellant testified that at Ms. Taylor's apartment, he and Ms. Taylor had a conversation at the kitchen door out of the presence of the other adults. The appellant told her that he wanted to see his daughter; Ms. Taylor then instructed him to come in through the front door. When the appellant went around to the front door, Ms. Taylor had rejoined the card game. The appellant testified that when he entered the room, Montegut jumped up and headed toward a table with a knife on it. This table was five to six feet from Montegut. The appellant followed, saw the knife on the table, grabbed it and began to fight with Montegut. The appellant stated that he "jugged" the victim two or three times. He stated that the fight lasted for ten to fifteen minutes and that he could not recall what he had done with the knife afterwards. When Montegut left the apartment, the appellant left as well. The appellant explained that he did not call the police because he did not know what to do, having just stabbed a man during a fight. He admitted that he had not thought to call the police and that he had been "on the lam" for four to five months until he had become tired of hiding out.
On cross-examination, the appellant stated that the table, where the knife had been, was not shown in the pictures of the scene taken shortly after the stabbing. He could not explain why it was not depicted. He admitted that he had "slapped [Ms. Taylor] a few times" when they lived together. He also admitted that he was initially angry when he heard that she and Montegut were planning to move to California with the appellant's daughter. However, he stated that he did not "blame" Montegut for the move. Finally, the appellant admitted that Montegut had tripped and fallen before reaching the table with the knife on it. Consequently, the appellant arrived at the table first. The appellant explained that he then stabbed Montegut in the back as the latter turned toward him while still on the floor. The appellant described Montegut as one or two inches taller, but of the same age.
On rebuttal, Ms. Taylor denied speaking with the appellant immediately before the stabbing incident. She reiterated that the appellant entered the room carrying a knife and stabbed the victim in the back.

Errors Patent
A review for errors patent reveals none.

Assignment of Error
In his sole assignment of error, the appellant asserts that the trial court erred in failing to modify the verdict of guilty of second degree murder and render a judgment of guilty of manslaughter. The appellant argues (1) that the state failed to prove that he did not act in self defense and, alternatively, (2) that the mitigating factors of manslaughter were established by a preponderance of the evidence.

Justifiable Homicide Defense
The appellant first contends the state failed to prove that the killing was not justified.
Second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. R.S. 14:30.1. A homicide is justifiable when committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger. R.S. 14:20(1). When a defendant claims self-defense, the state has the burden of establishing beyond a reasonable doubt that he did not act in self-defense. State v. Garcia, 483 So.2d 953 (La.1986); State v. Matthews, 464 So.2d 298 (La.1985); State v. Dozier, 553 So.2d 911 (La.App. 4th Cir.1989), writ denied, 558 So.2d 568 (La.1990).
The constitutional standard for testing the sufficiency of the evidence, enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), requires that a conviction be based upon proof sufficient for any rational trier of fact, viewing the evidence *316 in the light most favorable to the prosecution, to find the essential elements of the crime charged beyond a reasonable doubt. The question presented is whether the appellant acted without justification. Accordingly, the relevant inquiry is whether a rational factfinder, after viewing the evidence in the light most favorable to the prosecution, could have found beyond a reasonable doubt that the appellant did not act in self-defense. State v. Rosiere, 488 So.2d 965 (La.1986).
In considering a self-defense claim, it is necessary to consider whether the defendant had a reasonable belief that he was in imminent danger of losing his life or receiving great bodily harm and whether the killing was necessary, under the circumstances, to save the defendant from that danger. Dozier, 553 So.2d at 913. Although there is no unqualified duty to retreat, the possibility of escape is a factor in determining whether or not a defendant had the reasonable belief that deadly force was necessary to avoid the danger. Id.
The appellant argues that the killing was justified, noting that Montegut had made "serious threats" against him and that these threats had been communicated to him, albeit by other people. However, he states that he felt no fear that night until he saw Montegut rush toward the knife which had been placed on the table. He states that all three eyewitnesses had testified that they did not see a knife in his hand when he entered the room. Under these facts, he argues, it was reasonable for him to believe that he had been in imminent danger.
The appellant, however, mischaracterizes the testimony of the eyewitnesses. Ms. Turner stated that, although she did not see the knife at the moment the appellant entered the room, she saw it when the appellant raised his arm and stabbed Montegut in the back. McGee specifically testified that he saw the knife in the appellant's hand as he entered the room. McGee further stated that Montegut did not have a knife. Finally, Ms. Taylor also testified that she saw the knife in the appellant's hand when he raised his arm and stabbed Montegut in the back. Importantly, no witness corroborated the appellant's testimony that there was a knife lying on a table and that Montegut had rushed toward it when the appellant entered the room. Finally, even under the appellant's version of the incident, he admitted that he had reached the knife before Montegut and that Montegut was on the floor when he stabbed Montegut in the back.
Under these circumstances, the state met its burden of proving that the appellant had not acted in self-defense when he stabbed Montegut in the back. Obviously, the jurors discounted the appellant's testimony that Montegut had attempted to attack him when he entered the room. Such credibility determinations, as well as the weight to be attributed to the evidence, are soundly within the province of the jury's trial function. State ex rel. Graffagnino v. King, 436 So.2d 559 (La.1983). There is, therefore, no evidence that the appellant reasonably believed that he was in imminent danger of losing his life or receiving great bodily harm when he entered the apartment and attacked Montegut from behind. Compare Rosiere, 488 So.2d at 969 (witnesses testified that the victims were unarmed and that nothing which could have been interpreted as gunfire had come from their direction). Additionally, the appellant's account of the incident, in which he admits that he had reached the knife before Montegut and that Montegut had fallen on the floor, does not support a finding that the appellant reasonably believed that the killing was necessary to save himself from any imminent loss of life or great bodily harm. Accordingly, this argument is without merit.

Manslaughter
In the alternative, the appellant contends that his conviction should be reduced to manslaughter.
Manslaughter is a homicide which would be first or second degree murder, but the offense is committed in "sudden passion" or "heat of blood" immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection. R.S. 14:31. "Sudden passion" and "heat of blood" are not elements of the offense of manslaughter; rather, they are mitigatory *317 factors, in the nature of a defense, which diminish the degree of culpability and reduce the grade of the offense from murder to manslaughter. State v. Lombard, 486 So.2d 106 (La.1986); State v. Silbey, 450 So.2d 710 (La.App. 4th Cir.1984). Since they are mitigating factors, the defendant has the burden of proving by a preponderance of the evidence that he acted in "sudden passion" or "heat of blood" before he is entitled to a manslaughter verdict. State ex rel. Lawrence v. Smith, 571 So.2d 133 (La.1990); Lombard, 486 So.2d at 111. These factors need not be established affirmatively but may be inferred by the jury from the circumstances of the crime. State v. Tompkins, 403 So.2d 644 (La.1981); State v. Peterson, 290 So.2d 307 (La.1974). In reviewing a claim that the defendant acted in "sudden passion" or "heat of blood," the court must determine whether a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that those mitigating factors were not established by a preponderance of the evidence by the defendant. Lombard, 486 So.2d at 111; Dozier, 553 So.2d at 914; State v. Cheatham, 519 So.2d 188 (La.App. 4th Cir.1987), writ denied, 523 So.2d 228 (La.1988).
The appellant argues that the factors of "sudden passion" or "heat of blood" were proved by a preponderance of the evidence. He notes that before the incident, he had only heard that Montegut was living in the appellant's former home and that Montegut was the new "husband" in the home with the appellant's former "wife" and daughter. He notes that he also knew through third parties that Montegut had threatened his life. He states that the incident in the apartment was his and Montegut's first meeting. At that point, he argues, he realized that this man, who had threatened his life, was preparing to leave for California with Ms. Taylor and his [the appellant's] daughter. He contends that this was sufficient provocation to deprive him of his self-control.
The question is whether such provocation was immediate and sufficient to deprive an average person of his self-control and cool reflection. Admittedly, the bitter break-up of a romantic relationship and the fact that the former girlfriend and her daughter were leaving the city with another man would be upsetting to the average person. However, the jury obviously believed that these circumstances were not sufficiently provocative to deprive a reasonable person of his self control and cool reflection. Indeed, other evidence established that the appellant had planned to attack Montegut before reaching the apartment: The appellant had told Ms. Taylor of wanting to kill Montegut some three days prior to the incident. Although the appellant stated that he went to the apartment to see his daughter, he admitted not having visited the child at her grandmother's home, the usual site of their visits, for several weeks. Additionally, when asked why he was visiting the child so late at night, he insisted that the child was allowed to stay up late on weekends. The incident, however, occurred on a Sunday around 10:00 p.m. Furthermore, and perhaps most important, all three eyewitnesses testified that the appellant entered the living room, through an open door and without saying a word to anyone, and immediately began to stab Montegut in the back with a knife the appellant had had in his hand. Finally, the appellant hid from the authorities for over six months before his mother told police of his whereabouts.
Under these circumstances, it cannot be said that the jurors were wrong in finding that the mitigating factors had not been proved by a preponderance of the evidence. Indeed, the evidence was sufficient to lead a reasonable trier of fact to believe that the defendant had instigated the confrontation with Montegut and had been prepared to kill him. Compare Dozier, 553 So.2d at 914 (evidence that defendant had started the confrontations and had refused to move his vehicle was sufficient evidence of hostility to support belief that defendant had awaited confrontation and had been prepared to kill). Accordingly, this argument is without merit.
For the foregoing reasons, the conviction and sentence is affirmed.
AFFIRMED