Leon Cannizzaro, Donna Andrieu, Irena Zajickova, DISTRICT ATTORNEY'S OFFICE, ORLEANS PARISH, 619 S. White Street, New Orleans, LA 70119, COUNSEL FOR THE STATE OF LOUISIANA/APPELLEE
Holli Herrle-Castillo, LOUISIANA APPELLATE PROJECT, P. O. Box 2333, Marrero, LA 70073-2333, COUNSEL FOR DEFENDANT/APPELLANT
(Court composed of Judge Roland L. Belsome, Judge Regina Bartholomew-Woods, Judge Dale N. Atkins )
Judge Dale N. Atkins *972 Kenneth and Lakeitha Joseph ("victims") were reported missing on February 19, 2014. Nearly a month later, their bodies were recovered from the Intracoastal Waterway in New Orleans. After a lengthy investigation that brought investigators to Georgia, Texas, and across southeast Louisiana, the New Orleans Police Department determined that several people were involved in the double murder and had conspired to cover up the evidence.
On August 28, 2014, the State charged Horatio Johnson ("defendant") with two counts of second degree murder, a violation of La. R.S. 14:30.1 ; one count of conspiracy to commit obstruction of justice by tampering with evidence, a violation of La. R.S. 14:26 and 14:130.1 ; and one count of obstruction of justice, a violation of La. R.S. 14:130.1, in connection with the murders of defendant's cousin, Kenneth Joseph, and Kenneth's wife, Lakeitha Joseph.[1]
Defendant pled not guilty to all charges on September 4, 2014. On January 21, 2017, the trial court denied defendant's motions to suppress evidence, identification, and statements. A jury trial was held between August 21 and August 31, 2017. The State presented testimony from several witnesses and introduced numerous exhibits. After the State rested its case, defense counsel notified the court that it did not intend to call any witnesses. The jury returned a verdict of guilty on all counts, with eleven-to-one verdicts for the second degree murder convictions and the conspiracy to obstruct justice conviction, and a unanimous verdict to convict for obstruction of justice.
Defendant filed a motion for post-verdict judgment of acquittal and a motion for new trial, both of which the trial court denied. Defendant was sentenced to life imprisonment without benefit of parole, probation, or suspension of sentence on each count of second-degree murder (counts 1 and 2); twenty years for the count of conspiracy to obstruct justice (count 3); and forty years for obstruction of justice (count 4), with the sentences to be served consecutively. Defendant now appeals his convictions. We affirm defendant's conviction and sentences.
FACTS
Kenneth and LaKeitha Joseph borrowed a Dodge Caravan from Kenneth's sister, Ms. Alosia Hayward, on February 18, 2014. When they did not return the van to Ms. Hayward the following morning, she tried calling them throughout the day, but she received no response. That evening, she, her mother, and her sister drove to the victims' home in Reserve, Louisiana, but neither the van nor the Josephs were there. The victims' house had been ransacked. Ms. Hayward stated that either her mother or her sister reported the Josephs missing to the St. John the Baptist Parish authorities.
Crime Scene Investigator Scotty Lewis with the St. John the Baptist Parish Sheriff's *973 Office testified that he investigated a call of a residential burglary at 530 Homewood Place in Reserve. Lewis spoke with the first responding officer on the scene, photographed the exterior and interior of the residence, and swabbed various surfaces in the residence for DNA.
Detective Kirsten McAbee of the St. John the Baptist Parish Sheriff's Office[2] began investigating the victims' disappearance by entering their names into the national database of missing persons and posting neighborhood flyers. McAbee obtained the victims' cell phone records, which showed that Lakeitha Joseph's last outgoing call occurred on the night that she went missing, February 18, 2014. Detective McAbee's analysis indicated that Lakeitha's phone moved from Reserve to LaPlace to Lutcher and, finally, to Kenner on that same date. McAbee also obtained a search warrant for defendant's residence in LaPlace, and a warrant to search the home of Brittany Martin, defendant's girlfriend. McAbee confiscated a Toshiba laptop computer and an iPad from the victims' residence. McAbee subsequently learned that the victims' van was sighted at a Georgia Travelodge Hotel and that the van was associated with a Travelodge guest named Frank Mike.
In Georgia, Officer James Jackson, Jr. of the Fulton County Police Department responded to a call of an abandoned Dodge Caravan in the College Park area on February 27, 2014. Jackson learned that the van had been reported stolen from LaPlace, Louisiana, and the report bore the notation "missing endangered person. Hold for latent prints." Jackson impounded the vehicle for processing.
Fulton County Police notified Detective McAbee that they had located the victims' missing van in College Park, Georgia. The Georgia authorities searched the area for the victims, canvassed for witnesses, and obtained a search warrant for the van.
Ms. Helen Weathers was an expert forensic crime scene investigator for the Fulton County Police Department in Atlanta, Georgia. On March 1, 2014, pursuant to a warrant, she processed the 2010 Dodge Caravan. She photographed the van and examined its exterior and interior, noting that it had recently been washed, but the tires had not been cleaned and were visibly dirty. The key was in the ignition; a receipt from LaPlace, Louisiana, was found; and two coffee packets were seen in the front console. There were reddish stains on the floor board near the sliding door on the side of the van and on the floor next to the driver's seat, large blood stains on and under the second-row and third-row seats and floor mats, and blood stains behind the side interior paneling. Ms. Weathers swabbed the interior of the van for DNA evidence and collected other evidence from the van's interior, all of which was subsequently transferred to the New Orleans Police Department (NOPD). Ms. Weathers also obtained guest registration information and surveillance video from the Travelodge Hotel in College Park, Georgia.
Lakeitha Joseph's body was recovered from the Intracoastal Waterway in New Orleans on March 10, 2014. Several days later, on March 22, 2014, the NOPD retrieved Kenneth Joseph's body, bound in blue rope with a kettle bell attached, from the same waterway. The case was now designated as a homicide investigation.
*974 NOPD Detective Robert Bachelder was present at the scene when both bodies were retrieved. At trial, Bachelder identified crime lab photographs showing that the victims' ankles were bound by rope, and that a thirty-pound kettlebell was attached to the rope that bound Kenneth Joseph's ankles.
Dr. Erin O'Sullivan, a forensic pathologist with the Orleans Parish Coroner's Office, performed an autopsy on the body of Lakeitha Joseph. Ms. Joseph had suffered a subscapular hemorrhage on the left side of her head, as if she had been struck; however, Dr. O'Sullivan testified that the blow would not have caused her death, as there was no accompanying fracture of the skull. Dr. O'Sullivan noted that the blue rope knotted around the victim's ankles had caused abrasions to the skin on the legs. In addition, the victim's lower right leg was fractured. Dr. O'Sullivan found no evidence of gunshot or knife wounds. She stated that Ms. Joseph died of asphyxia by drowning.
Dr. Richard Tracy, another pathologist with the Orleans Parish Coroner's Office, performed an autopsy on the body of Kenneth Joseph. Mr. Joseph's body had arrived at the Coroner's Office with a kettlebell and rope attached to his legs. The body exhibited signs of decomposition, bloating, and discoloration of skin, but there were no signs of penetrating or blunt force injuries, and no hematomas or broken bones. Dr. Tracy testified that Orleans Parish Coroner Dr. Rouse classified the death as a homicide by drowning.
Other parties who had been charged with the disappearance of the Josephs testified for the State at defendant's trial. Frank Mike[3] testified that he arrived at his house in New Orleans East on February 19, 2014, to find a silver Dodge Caravan parked in his driveway by his friend Steven "Future" Bradley.[4] Bradley, along with Horatio Johnson, Amir "Blue" Ybarra, and an unknown black female arrived at Mike's house and moved the van to the back of the house. Bradley gave Mike permission to drive the van to Atlanta on business, but Bradley instructed Mike not to put anything in the back of the van because it might be stained by blood. When Mike opened the van's door, he saw blood in the back.
Mike testified that he arrived in the Atlanta area on February 20, 2014, and booked a room at the Travelodge Hotel in College Park for two nights. Mike later learned that a van just like the one he borrowed from Bradley was connected to a missing couple from Reserve, Louisiana.
*975 During the two days he was in Atlanta, Mike repeatedly tried to call Bradley. When Bradley finally returned Mike's calls, he did so using defendant's cell phone. Mike decided to abandon the van. He washed it, vacuumed the inside, wiped down the interior, and parked it at an apartment complex about a mile from the Travelodge Hotel. Mike and Bradley later got into a heated argument by cell phone, during which Bradley told Mike that he had used the van to rob a couple of $ 200,000.00 and several bricks of cocaine.
On April 3, 2014, after learning that the victims' bodies had been recovered, Mike spoke to NOPD Detective Ryan Vaught and identified photos of Bradley and defendant, whom he knew as "Horatio."
Mr. Donald Silva, a former bail bondsman and friend of Bradley, testified that he told the police that Bradley had confessed to him that the Josephs were lured to a recording studio in the 2400 block of David Drive where they were beaten to death by Steven Bradley, Amir "Blue" Ybarra, and defendant. Silva testified that Bradley and Ybarra transported the victims' bodies in a van and dumped them in the Intracoastal Waterway, as defendant had instructed. Silva added that the motive for the murders was a large sum of money. On cross-examination, Silva confirmed that he was not present when the murders occurred and that he had learned of the murders from Bradley.
Ms. Brittany Martin also was charged with the second degree murders of Kenneth and Lakeitha Joseph, but she pled guilty to obstruction of justice in exchange for the State's agreement to dismiss the second-degree murder charges against her.[5]
At defendant's trial, Ms. Martin described defendant as her boyfriend, indicating that they began their romantic relationship about two years before the murders. Ms. Martin said that she was in love with defendant and thought that they would marry. She testified that on February 18, 2014, she received a telephone call from defendant asking her to meet him at a recording studio on David Drive. From the studio, she accompanied defendant to a warehouse near the airport where Kenneth and Lakeitha Joseph met them. The Josephs arrived at the warehouse in a van and stood outside talking to defendant. She and defendant then drove back to the recording studio in her Toyota Scion while the Josephs followed in their van. Defendant and Kenneth Joseph entered the studio while she and Lakeitha Joseph remained in their respective vehicles. Twenty minutes later defendant exited the studio and summoned Ms. Martin and Lakeitha Joseph into the studio to hear Kenneth Joseph rapping. Lakeitha entered the dark studio followed by defendant and Ms. Martin, at which point defendant began to strangle Lakeitha Joseph. Ms. Martin screamed and ran outside, then returned to the studio because she thought she had left her car key. When she realized her car key was in her back pocket, she exited the studio and drove to a gas station on Veterans Boulevard where she sat and drank a soda. She stated that she did not call the police because she was in shock and was not thinking clearly. Defendant called her and asked her to return to the studio, and she complied.
When she returned, defendant greeted Ms. Martin outside. Defendant re-entered the studio, but she remained in her car. She claimed that she did not call the police at that time because she feared what defendant might do to her family. When she *976 told defendant she was leaving, he got into the car with her. They drove to a retail store where she purchased a knife for protection and hid it in her bra. She drove back to the recording studio and defendant went inside while she sat in her car. Fifteen minutes later they drove to defendant's residence in LaPlace where he washed and changed his clothes and shoes. He packed the items that he had been wearing in a plastic bag, which he put in the trunk of her car. They drove to a deserted area so defendant could burn the bag. After burning the bag of clothing, they drove to the Walmart in Kenner, arriving about 1:00 a.m. Defendant took her car key and made her enter the store with him. Defendant purchased rope, a kettlebell, gloves, articles of clothing, and degreaser. They checked out at the self-serve register using Ms. Martin's American Express card and returned to the recording studio. Ms. Martin remained in her car as the defendant entered the studio with the items purchased at Walmart.
Ms. Martin noticed that the Joseph's van was still parked in the back of the studio. About twenty minutes later, defendant exited the studio accompanied by Bradley and "Blue," who drove the victims' van to the front door, where the men loaded two large items into the back of the van. Ms. Martin thought the items were the victims' bodies.
According to Ms. Martin, Steven Bradley and "Blue" drove the van, with defendant and Ms. Martin following in Ms. Martin's Scion, to New Orleans East, where the victims' bodies were tossed into the water. They then went to LaPlace for gas, but Ms. Martin's credit card was declined. Bradley and Blue later met Ms. Martin and defendant and traveled to Baton Rouge to Bradley's mother's house; they all then went to "Box's" house and cleaned the van's interior and exterior. After cleaning it, Bradley and "Blue" drove the van back to Frank Mike's house in New Orleans. After the men spoke with Mike, Ms. Martin drove them back to the recording studio. According to Ms. Martin, defendant and "Blue" got manicures to remove the blood from under their nails; she drove to Wendy's for food and then drove defendant home.
Ms. Martin continued her romantic relationship with defendant until May 7, 2014, when she surrendered to the police. Sometime before turning herself in, however, Ms. Martin and defendant drove to Texas where they purchased two thirty-pound kettlebells.[6] Defendant instructed Ms. Martin to take them to her home and, if anyone asked, she should say that she used them to exercise. Ms. Martin testified that when she left defendant, he warned her to keep quiet.
Under cross-examination, Ms. Martin stated that she met defendant while she was a correctional officer. Attempting to refute Ms. Martin's assertion that she did not go to the police because she feared the consequences from defendant, counsel for defendant elicited testimony that between February 18, 2014, and April 9, 2014, Ms. Martin was researching engagement and wedding rings, honeymoon destinations, and car and real estate prices in and around the New Orleans area. She also said she accompanied defendant to visit his family in Texas on March 30, 2014, where they celebrated her birthday. Defense counsel also confronted Ms. Martin with romantic letters that she sent defendant while both she and defendant were incarcerated on these charges. Defense counsel posited that Ms. Martin accused defendant of the murders in retaliation for reneging *977 on his promise to marry her, but Ms. Martin denied that assertion.
Marvin Buendia testified that he and defendant were friends, and that he had done some graphic design work for defendant's business and for Ms. Martin's business. Around April 25, 2014, Buendia drove defendant to an apartment on Houma Boulevard and then drove home. Defendant returned to Buendia's house accompanied by Ms. Martin; they spent the night at Buendia's house. The following morning, defendant asked Buendia to take a ride with him, and defendant, Buendia, and Ms. Martin drove to a Walmart in Texas. Defendant told Buendia to purchase a thirty-pound kettlebell, which defendant had placed in a specific location in the store. They traveled to another Walmart where defendant and Buendia repeated the routine, and then returned to Buendia's residence, where defendant and Ms. Martin spent the night. A few days later, defendant told Buendia that if anyone asked, he should say that defendant spent the night of February 18, 2014, at Buendia's house.
Warren Chambliss was employed as an asset protection manager at the Walmart Store in Kenner in 2014. He retrieved a self-checkout transaction receipt dated February 19, 2014, for the purchase of two kettlebells, two fleece hoodies, three pairs of gripping gloves, utility line, two pairs of men's shoes, and degreaser, which he turned over to NOPD Detective Rob Barrere. Chambliss also produced store video surveillance of Brittany Martin and defendant purchasing these items and exiting the store on February 19, 2014, at 12:33 a.m. The purchase was made with Brittany Martin's American Express card.
Detective Barrere assisted Detective Ryan Vaught, the lead investigator in this case, by canvassing the victims' neighborhood in Reserve for witnesses and surveillance video. Barrere learned that a next-door neighbor had heard loud knocking at the victims' residence the night they had gone missing; the neighbor looked outside and noticed that the victims' van was missing. Barrere also learned that the Kenner Walmart carried the same kettlebell as the one found attached to the male victim's body. Barrere viewed store surveillance video and identified Ms. Martin and defendant purchasing two 30-pound kettlebells and the other items.
NOPD Commander Nicholas Gernon was a homicide sergeant in March 2014. Gernon assigned Detective Ryan Vaught to lead the investigation into the death of Lakeitha Joseph. Gernon also participated in the search of Brittany Martin's residence in LaPlace on May 7, 2014, while Detective Vaught simultaneously led the team that searched defendant's Van Arpel Drive home. Gernon verified that two kettlebells, blue rope, gloves, cleaning supplies, a firearm, and ammunition were confiscated from Ms. Martin's bedroom.
Lead investigator Detective Vaught was present when Lakethia Joseph's body was found on March 10, 2014. Vaught conducted door-to-door canvassing of the victims' neighbors and learned that a disturbance was reported at the victims' residence in the early morning of February 18, 2014. He also discovered that Lakethia Joseph was last seen in her sister-in-law's 2012 Dodge Caravan, which was subsequently recovered and forensically processed by Georgia State authorities.
Vaught arrived in Georgia on March 19, 2014, to examine the van and view the surveillance video from the Travelodge Hotel in College Park. Ms. Helen Weathers assisted Vaught's investigation in Georgia by obtaining the guest registration information from the Travelodge where the van had been seen. With DNA evidence recovered from the interior of the *978 van, Vaught identified the driver of the van at that time as Frank Mike.[7]
Vaught returned to New Orleans on March 22, 2014, the day that Kenneth Joseph's body was recovered. Vaught resumed the investigation and learned that Mr. Joseph's body had been bound with rope and anchored with a thirty-pound kettlebell to submerge it. Subsequent investigation proved that two kettlebells and blue rope similar to that found on the victims' bodies, plus two fleece hoodies, three pairs of latex gloves, fishing line, utility line, two pairs of men's shoes, and degreaser were purchased from the Walmart in Kenner on February 19, 2014, with Brittany Martin's credit card, and the transaction was captured on Walmart's surveillance video.
The search of Frank Mike's residence yielded items of clothing that Mike was seen wearing in the Travelodge surveillance video. When Vaught spoke to Mike after the search, Mike admitted that he had driven the victims' van to Georgia; identified himself in the Travelodge surveillance video; and subsequently identified a photo of Steven Bradley as the person who lent him the van. Further, Mike identified a picture of defendant as one of the people present when Mike received the van from Bradley.
Following an interview and photo identification by Bradley, Vaught obtained arrest warrants for defendant, Ms. Martin and Amir "Blue" Ybarra and also placed Bradley under arrest. From the suspects, Vaught learned that the victims were lured to the recording studio in the 2400 block of David Drive, where they met their demise. The search of defendant's residence on May 7, 2014, produced two iPhones. And when the recording studio was searched on May 21, 2014, Vaught confiscated a bottle of degreaser that matched one of the items Ms. Martin and defendant had purchased at the Kenner Walmart on February 19, 2014.[8]
Vaught testified that throughout this investigation and prior to the arrest of *979 Brittany Martin, he received information suggesting that Martin was in danger of receiving bodily harm from the defendant. Vaught obtained a trap and trace warrant for Martin's cell phone, and with the help of the U.S. Secret Service, he intercepted Martin returning to New Orleans from Baton Rouge. Vaught informed her of the threat to her safety and seized her cell phone. Vaught obtained "phone dumps" (digital forensics extraction reports) of the cell phones belonging to defendant, Ms. Martin, Steven Bradley, and Frank Mike, including subscriber identification, incoming/outgoing calls, photographs, Instagram and text messages, and cell tower information. Through the use of cell phone tower information in conjunction with static license plate readers and credit card statements, Vaught was able to verify the February 2014 travel information, including pertinent time frames, and the location of evidence-burn areas and body disposal. Moreover, Vaught supplied exhaustive testimony concerning the cell phone calls made by and between defendant, Martin, Bradley and Mike around the time of the murders.
Vaught interviewed Ms. Martin three times in January 2015, and Martin showed Vaught the locations where defendant burned or destroyed evidence, in Manchac and Baton Rouge, and where the bodies had been disposed near Chalmette.
ERRORS PATENT
Our review of the record revealed no errors patent.
LAW AND ANALYSIS
Defendant asserts three assignments of error: (1) the trial court erred in denying defendant's motion for post-verdict judgment of acquittal based on the insufficiency of evidence presented by the State; (2) this Court erred when it reversed the trial court's decision to grant a mistrial due to Brittany Martin's reference to defendant's prior conviction for manslaughter, in violation of the trial court's order; and (3) the non-unanimous "guilty" verdicts are unconstitutional, and defendant is entitled to have his case retried. We address each of these assignments of error in turn.
ASSIGNMENT OF ERROR NUMBER 1
In his first assignment of error, the defendant argues that the trial court erred in denying his motion for post-verdict judgment of acquittal based on the insufficiency of evidence presented by the State. Defendant complains that his convictions were based solely upon the testimony of criminals, drug dealers, and the woman he scorned.
A post-verdict judgment of acquittal "shall be granted only if the court finds that the evidence, viewed in a light most favorable to the state, does not reasonably permit a finding of guilty." La. C.Cr.P. art. 821(B) ; State v. Thibodeaux, 98-1673, p. 12 (La. 9/8/99), 750 So.2d 916, 926 ; State v. Simmons , 2007-0741, p. 15 (La. App. 4 Cir. 4/16/08), 983 So.2d 200, 208 ("A motion for post verdict judgment of acquittal raises the question of the sufficiency of the evidence."). This standard "is similar to the standard for appellate review of the sufficiency of evidence to support a defendant's conviction that the court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt." State v. Williams , 2004-1377, pp. 7-8 (La. App. 4 Cir. 12/1/04), 891 So.2d 26, 30.
This Court reiterated the applicable standard of review for sufficiency of the evidence challenges in State v. Rapp , 2014-0633, pp. 5-6 (La. App. 4 Cir. 2/18/15), 161 So.3d 103, 108 (quoting *980 State v. Marcantel , 2000-1629, p. 8 (La. 4/3/02), 815 So.2d 50, 55 ):
The standard of review for the sufficiency of the evidence to uphold a conviction is whether or not, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could conclude that the State proved the essential elements of the crime beyond a reasonable doubt. See LSA-C.Cr.P. art. 821 ; State v. Hampton , 98-0331, p. 13 (La. 4/23/99), 750 So.2d 867, 880, cert. denied , 528 U.S. 1007, 120 S.Ct. 504, 145 L.Ed.2d 390 (1999). Pursuant to Jackson v.Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the standard of review is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. Louisiana Revised Statute 15:438 provides that the fact finder, when analyzing circumstantial evidence, must be satisfied the overall evidence excludes every reasonable hypothesis of innocence. State v. Mitchell , 99-3342, p. 7 (La. 10/17/00), 772 So.2d 78, 83.
Additionally, "[i]n the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient to support a factual conclusion." State v. Williams , 2011-0414 p. 18 (La. App. 4 Cir. 2/29/12), 85 So.3d 759, 771. "Under the Jackson [v. Virginia ] standard, the rational credibility determinations of the trier of fact are not to be second guessed by a reviewing court" because "a factfinder's credibility determination is entitled to great weight and should not be disturbed unless it is contrary to the evidence." Id.
Two of the four counts upon which defendant was convicted were for second-degree murder. Under La. R.S. 14:30.1, second-degree murder is defined as the killing of a human being "when the offender has a specific intent to kill or to inflict great bodily harm." To prove second degree murder, "the state must prove the killing of a human being either with specific intent or when the offender is engaged in one of the listed crimes." State v. White , 2014-0397, p. 17 (La. App. 4 Cir. 7/29/15), 174 So.3d 177, 189. "Specific intent" is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10 (1).
The State's evidence in this case amply supports defendant's conviction on two counts of second degree murder. Brittany Martin testified that she saw Kenneth Joseph enter the recording studio with the defendant, and a few moments later she witnessed defendant lure Lakeitha Joseph into the studio. Martin testified that defendant began strangling Lakeitha Joseph in Martin's presence. Moments later, Martin accompanied defendant to the Kenner Walmart where he purchased kettlebells, rope, gloves and cleaning products. Martin returned to the recording studio with defendant and observed Amir "Blue" Ybarra and Steven "Future" Bradley place two large objects in the back of the victims' van. Martin testified that the objects were each the size of a human body. Martin then accompanied defendant to his residence where he changed clothes and bagged the clothing he had been wearing. Ybarra and Bradley drove the van, followed by Martin and defendant in Martin's car, to a deserted area in New Orleans East where they tossed the victims' bodies in the waterway.
Donald Silva also testified that Steven Bradley had confessed his participation in the murders, corroborating Brittany Martin's testimony that defendant had choked Lakeitha Joseph and that he had beaten the victims with bar stools.
*981 The medical evidence presented at trial established that the victims died by drowning. The forensic pathologists testified about rope binding the bodies at the time they were retrieved from the Intracoastal Waterway with a kettlebell attached to Mr. Joseph's ankles.
The testimony and evidence offered at trial demonstrates that defendant possessed the specific intent to kill the victims and, when viewed in the light most favorable to the prosecution, establishes that a rational factfinder could have determined that defendant was guilty on two counts of second-degree murder.
Defendant was also found guilty of La. R.S. 14:130.1, [o]bstruction of justice, which provides, in pertinent part:
A. The crime of obstruction of justice is any of the following when committed with the knowledge that such act has, reasonably may, or will affect an actual or potential present, past, or future criminal proceeding as hereinafter described:
(1) Tampering with evidence with the specific intent of distorting the results of any criminal investigation or proceeding which may reasonably prove relevant to a criminal investigation or proceeding. Tampering with evidence shall include the intentional alteration, movement, removal, or addition of any object or substance either:
(a) At the location of any incident which the perpetrator knows or has good reason to believe will be the subject of any investigation by state, local, or U.S. law enforcement officers; ...
The knowledge requirement of La. R.S. 14:130.1(A) is met if the perpetrator merely knows that an act "reasonably may" affect a "potential" or "future" criminal proceeding. State v. Jones, 2007-1052, p. 9 (La. 6/3/08), 983 So.2d 95, 101. "The defendant must also have tampered with evidence 'with the specific intent of distorting the results' of a criminal investigation." State v. Powell , 2015-0218, p. 11 (La. App. 4 Cir. 10/28/15), 179 So.3d 721, 728 (quoting La. R.S. 14:130.1(A)(1) ). However, "nothing beyond 'movement' of the evidence is required by the statute if accompanied by the requisite intent and knowledge." Id. (citing Jones, 2007-1052, p. 10 (La. 6/3/08), 983 So.2d at 101 ).
Some of defendant's efforts to obstruct justice and destroy evidence include: 1) binding and weighting the victims' bodies with rope and kettlebells to prevent discovery; 2) burning the clothes he wore at the time of the killings, and purchasing additional clothing and cleaning products; 3) cleaning the interior of the victims' van and disposing of its contents; 4) having his hands manicured to destroy trace and/or blood evidence; 5) enlisting Marvin Buendia's assistance in purchasing two "substitute" kettlebells, and 6) instructing Brittany Martin to lie to the police and say that she used the replacement kettlebells for exercise. This evidence sufficiently establishes a basis upon which the factfinder could reasonably determine that defendant was guilty of obstructing justice in violation of La. R.S. 14:130.1.
Regarding defendant's challenge to the sufficiency of the evidence for the charge of conspiracy to obstruct justice, criminal conspiracy under La. R.S. 14:26 requires an agreement or combination of two or more persons for the specific purpose of committing any crime, an act in furtherance of the object of the agreement or combination, and specific intent.
Accepting Brittany Martin's testimony as true, a rational juror could have concluded that the State proved beyond a *982 reasonable doubt a conspiracy to commit obstruction of justice among defendant, Steven Bradley, and Amir Ybarra, for acting in concert to dispose of the victims' bodies and the van. The jury also could have found conspiracy to obstruct justice between defendant and Martin in conjunction with the Walmart purchases and the burning of defendant's clothes.
Although defendant argues that there is no physical evidence linking him to these crimes and further suggests that much of the testimony against him came from criminals or from the woman he scorned, video surveillance captures defendant and Ms. Martin purchasing kettlebells like those tethered to the victims' bodies in the water, and cleaning products, some of which were recovered from the recording studio. Moreover, defense counsel thoroughly cross-examined the State's witnesses to expose their criminal backgrounds and any motives for blaming defendant for these crimes. Despite the unfavorable light that defense counsel cast on the State's witnesses, the jury accepted their testimony as true and convicted defendant on all four counts.
"[I]t is not the function of the appellate court to reassess the credibility of witnesses or to reweigh the evidence; the reviewing court's function is to determine the constitutional sufficiency of the evidence presented." State v. Scott , 2012-1603, p. 11 (La. App. 4 Cir. 12/23/13), 131 So.3d 501, 508 (citing State v. Johnson , 619 So.2d 1102, 1109 (La. App. 4th Cir. 1993) ). "Credibility determinations, as well as the weight to be attributed to the evidence, are soundly within the province of the trier of fact." Id. (citing State v. Brumfield , 93-2404 (La. App. 4 Cir. 6/15/94), 639 So.2d 312, 316 ). "Moreover, conflicting testimony as to factual matters is a question of weight of the evidence, not sufficiency. Such a determination rests solely with the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness." Id. (citing State v. Jones , 537 So.2d 1244, 1249 (La. App. 4th Cir. 1989) ). "Absent internal contradiction or irreconcilable conflict with the physical evidence, a single witness's testimony, if believed by the fact finder, is sufficient to support a factual conclusion." State v. De Gruy, 2016-0891, p. 11 (La. App. 4 Cir. 4/5/17), 215 So.3d 723, 729-730 (citing State v. Marshall , 2004-3139, p. 9 (La. 11/29/06), 943 So.2d 362, 369 ).
Having reviewed the substantial amount of evidence and testimony in this case, we find it sufficient to support defendant's conviction on all four counts. Viewing the evidence in a light most favorable to the State, the trial court therefore correctly denied defendant's request for a post-verdict judgment of acquittal.
Defendant's first assignment of error has no merit.
ASSIGNMENT OF ERROR NUMBER 2
During trial, counsel for the defense elicited a statement from Brittany Martin that referenced another crime for which defendant had been jailed. The exchange occurred as follows:
Q. ... So that day, you put your hand on the Bible, court reporter says, do you swear to tell the whole truth and nothing but the truth?
A. Yes.
Q. Because perjury, apparently doesn't bother you, does it?
A. Yes, it does.
Q. Didn't that day, did it?
A. Because Horatio told me to say that I use [kettlebells] to exercise, or pretty much I was a loose end, which means I'm going to be killed. I have every reason to fear a person who's been in jail before for manslaughter.
*983 The trial court admonished the jury to "disregard the last comment." Defense counsel moved for a mistrial, which the trial court granted. The State sought supervisory review, and this Court reversed, finding that the trial court lacked authority to grant a mistrial under either La. C.Cr.P. art. 775 or La. C.Cr.P. art. 771. State v. Johnson , 2017-0717, p. 6 (La. App. 4 Cir. 8/27/17), 226 So.3d 1178, 1182.
Defendant contends that this Court erred when it reversed the trial court's grant of a mistrial, arguing that the trial court was in the best position to determine whether admonishing the jury was sufficient to guarantee defendant a fair trial. Defendant suggests the trial court did not abuse its discretion in declaring a mistrial, thus, this Court should not have overturned that ruling.
Defendant's second assignment of error invites this Court to reconsider its prior opinion, but that opinion is now the law of the case.[9] "Under the law-of-the-case doctrine, an appellate court will not reverse its pretrial determinations unless the defendant presents new evidence tending to show that the decision was patently erroneous and produced an unjust result." State v. Garrison , 2016-0257, p. 6 (La. App. 4 Cir. 3/29/17), 215 So.3d 333, 337-38, writ denied , 2017-0695 (La. 11/5/18), 255 So.3d 1055 (quoting State v. Golden , 2011-0735, p. 13 (La.App. 4 Cir. 5/23/12), 95 So.3d 522, 531 ). Defendant has failed to set forth any additional credible evidence demonstrating the prejudice that he allegedly suffered as a result of Ms. Martin's statement. Finding no error in our prior ruling, we decline to revisit it.
Finally, we have already established that the State introduced substantial evidence of defendant's guilt on all four counts, and any alleged error as a result of Ms. Martin's statement regarding defendant's prior conviction is harmless. See State v. Lyles , 2003-0141, p. 11 (La. App. 5 Cir. 9/16/03), 858 So.2d 35, 46 ("an improper reference to other crimes is subject to harmless error review ... [t]he test for determining harmless error is whether the verdict actually rendered in that case was surely unattributable to the error."). This assignment of error has no merit.
ASSIGNMENT OF ERROR NUMBER 3
In a final assignment of error, defendant argues that because his convictions for second degree murder and conspiracy to obstruct justice were rendered by non-unanimous jury verdicts, those convictions must be reversed because non-unanimous jury verdicts are unconstitutional. Defendant further contends that because his convictions are not yet final, he is entitled to a new trial on those counts pursuant to the 2018 amendment to *984 Article I, § 17 of the Louisiana Constitution and to La. C.Cr.P. art. 782, which now mandate unanimous guilty verdicts for offenses punished by confinement at hard labor. The 2018 amendments to which defendant refers provide:
A criminal case in which the punishment may be capital shall be tried before a jury of twelve persons, all of whom must concur to render a verdict. A case for an offense committed prior to January 1, 2019, in which the punishment is necessarily confinement at hard labor shall be tried before a jury of twelve persons, ten of whom must concur to render a verdict. A case for an offense committed on or after January 1, 2019, in which the punishment is necessarily confinement at hard labor shall be tried before a jury of twelve persons, all of whom must concur to render a verdict.
Defendant acknowledges that the amendment provides that the change in the law is prospective, but he nonetheless argues that under State v. Draughter , 2013-0914 (La. 12/10/13), 130 So.3d 855, 860, the amendment should be applied retroactively.
In Draughter , the Louisiana Supreme Court reviewed the trial court's decision declaring unconstitutional La. R.S. 14:95.1, a statute that prohibits a felon from possessing a firearm within a certain number of years after conviction. The trial court's determination was grounded in the Legislature's recent amendment to LA. CONST. art. I, § 11, providing that the right to keep and bear arms is a fundamental right. To evaluate the constitutionality of La. R.S. 14:95.1, the Court had to determine whether the older version of Article I, § 11, which invoked a "reasonableness" test for evaluating restrictions on the right to bear arms, applied, or whether the amended version, which required "strict scrutiny" when evaluating any restrictions on the fundamental right, would apply. "[W]e conclude the right to bear arms was always fundamental; the amendment to the constitutional provision merely sought to ensure that the review standard of an alleged infringement of this fundamental right was in keeping with the refinements made to constitutional analysis which developed since our decision in [ State v. Amos , 343 So.2d 166 (La. 1977) ]." Draughter , 2013-0914 (La. 12/10/13), 130 So.3d 855, 863.
The Louisiana Supreme Court concluded in Draughter that because the defendant's conviction was not final when an amendment to the Louisiana Constitution became effective, the amendment, which changed the standard of review that the Court must use in evaluating a restriction, had prospective effect, but would be retroactively effective to defendant Draughter and all other cases still pending on direct review or not yet final.
Here, the statutory amendments requiring unanimous jury verdicts do not declare non-unanimous jury verdicts unconstitutional, nor do they modify the standard of review that courts must apply when interpreting these statutes, as in Draughter . We find Draughter distinguishable and note that if this Court were to adopt defendant's argument and apply Draughter to the present facts, we would be usurping the function of the Legislature, which has clearly stated when the requirements for conviction by a unanimous jury verdict shall begin.
In addition, both the Louisiana Supreme Court and the United States Supreme Court have held that a statute permitting non-unanimous jury verdicts in non-capital cases is constitutional. State v. Bertrand , 08-2215, 08-2311, pp. 6-8 (La. 3/17/09), 6 So.3d 738, 742-43 ; Apodaca v. Oregon , 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972). The 2018 statutory amendments at *985 issue here do not undermine those holdings.
Finally, Louisiana follows the general rule that a constitutional provision or amendment has prospective effect only, unless a contrary intention is clearly expressed. State v. Cousan, 1996-2503, p. 17 (La. 11/25/96), 684 So.2d 382, 392-393. But we need not defer to the general rule, because LA. CONST. art. I, § 17 and La. C.Cr.P. art. 782, as amended in 2018 to require unanimous jury verdicts, explicitly provide that the amendment is applicable to offenses that occur on or after January 1, 2019 . This language could not be more clear.
There can be no retroactive application of these amendments, and defendant's convictions by non-unanimous jury verdict are not unconstitutional. Defendant's third assignment of error has no merit.
CONCLUSION
For the reasons assigned above, Horatio Johnson's convictions and sentences are affirmed.
AFFIRMED
BARTHOLOMEW-WOODS, J., CONCURS IN THE RESULT

Other parties were charged with the same or similar crimes relative to the murders of Kenneth and Lakeitha Joseph, but the present appeal addresses the charges against Horatio Johnson only.

When this investigation began, Detective McAbee was employed by the St. John the Baptist Parish Sheriff's Office; however, at the time this matter was tried, she was working for the Jefferson Parish Sheriff's Office. Detective McAbee's name is also spelled "McBee" at various places in the record.

Frank Mike was convicted of possession of a stolen vehicle in interstate commerce in federal court. He explained that he was involved in this case pursuant to his agreement to cooperate with the State and to testify at defendant's trial. Mike stated that he had been charged as an accessory after the fact to a homicide, obstruction of justice, and conspiracy to obstruct justice, but after agreeing to cooperate in the investigation of this case, he was allowed to plead guilty to three counts of obstruction of justice for which he received a nine-year sentence.

Steven Bradley was originally a co-defendant in this case. During the trial of Horatio Johnson, Bradley's attorney told the judge that Bradley had been offered use and derivative use immunity, but defense counsel refused the offer because the immunity document did not offer protection from prosecution for federal crimes. Consequently, Bradley's counsel advised the court that Bradley would invoke his Fifth Amendment privilege and refuse to testify in this case. The trial court addressed Bradley, who emphatically refused to answer any of the State's questions. Bradley informed the judge that he would assert his Fifth Amendment privilege to every question and indicated that he understood he would be held in contempt of court. No substantive testimony was elicited from Bradley at trial.

At the time of defendant's trial, she was awaiting sentencing.

The police seized the kettlebells when they searched Ms. Martin's home.

Prior to the testimony of Detective Vaught, the State stipulated to the following facts regarding the forensic investigation:
Forensic scientist Julia Kirk tested a swab taken from the right of the rear seat of the victims' van which indicated one contributor, Lakethia Joseph. Two swabs taken from the gear shift showed one contributor, Frank Mike. One piece of carpet floor panel from the left rear of the van showed one contributor, Kenneth Joseph. Two swabs taken from a stain on the carpet floor panel from the left rear area of the van showed two contributors, Kenneth Joseph and Lakethia Joseph. Ms. Kirk did not identify any DNA profiles from which defendant could be identified as the contributor.
Forensic scientist Stacey Williams took DNA swabs from the victims' residence, including from the dresser drawer handles, which were consistent with being a mixture of DNA from one major contributor and two minor contributors. Kenneth Joseph could not be excluded as the major contributor. No conclusions could be drawn regarding the minor contributor. The DNA profile obtained from the swab of the second bedroom light switch was consistent with being a mixture of DNA from two individuals, one major contributor and one minor contributor. Kenneth Joseph could not be excluded as the major contributor.
Forensic scientist Kacie Amarello tested for latent fingerprints, but no identification was made from two latent prints lifted from one of the coffee packets retrieved from the victims' van, and no latent prints could be developed on the kettlebell weight or blue rope found on Kenneth Joseph's body.

Detective Vaught explained that at the time the studio was searched, floors and walls were being replaced and the interior was being painted. The studio had been transferred to a new lessee, who was informed by Amir Ybarra, the previous lessee, that the building was moldy and should be cleaned with bleach and renovated before being used. Because of the renovations, crime lab personnel were unable to obtain any biological evidence from the site.

In State v. McElveen, 2010-0172, p. 24 n.8 (La. App. 4 Cir. 9/28/11), 73 So.3d 1033, 1054 n.8, this Court explained:
The "law of the case" doctrine applies to all prior rulings or decisions of an appellate court or the Supreme Court in the same case, not merely those arising from the full appeal process. See Pumphrey v. City of New Orleans, 2005-0979 (La. 4/4/06), 925 So.2d 1202. This policy applies to parties who were parties to the case when the former decision was rendered and who thus had their day in court. The reasons for the "law of the case" doctrine is to avoid relitigation of the same issue; to promote consistency of result in the same litigation; and to promote efficiency and fairness to both parties by affording a single opportunity for the argument and decision of the matter at issue. Day v. Campbell-Grosjean Roofing and Sheet Metal Corp., 260 La. 325, 256 So.2d 105 (1971). This doctrine is not an inflexible law; thus appellate courts are not absolutely bound thereby and may exercise discretion in application of the doctrine. It should not be applied where it would accomplish an obvious injustice or where the former appellate decision was manifestly erroneous.