SANDRA CABRINA JENKINS, Judge.
[ 1 Defendant, Frank Rainey, appeals his convictions and sentences for simple burglary and theft of copper. Defendant’s conviction and sentence for simple burglary are affirmed while his conviction and sentence for theft of copper are vacated and set aside.

STATEMENT OF THE CASE

The State originally charged Frank F. Rainey and Mark Mason[1] with the May 6, 2012 simple burglary of the World War II Museum, a violation of La. R.S. 14:62. On August 14, 2014, the State amended the bill of information, adding a second count, theft of copper worth $1,000.00 or more, a violation of La, R.S. 14:67.28(D)(1).
After a two day jury trial, the defendant was found guilty as charged as to simple burglary and guilty of the lesser charge of theft of copper valued at $500 but not less than $300. At the sentencing hearing, the defendant was sentenced to a term of twelve years at hard labor for simple burglary and four years at hard labor for theft of copper. The State filed a multiple offender bill of information charging the defendant as a second felony offender, and the defendant admitted to 12the allegations in the multiple bill of information. The trial court vacated the original sentence as to count one and resentenced the defen *441 dant to serve twelve years at hard labor. This appeal followed.

STATEMENT OF THE FACTS

Officer Billy Treigle responded to a call at the National World War II Museum on May 6, 2012. Two suspects had been apprehended at the corner of Annunciation and Calliope Street. When Officer Treigle arrived, Officer Tracie Madeus and Domestic Abuse Detective Eric Bare were at the scene. Officer Treigle interviewed security guard Andrew Ledet and lead contractor Edward Georgeson from the museum while the detective went inside the museum to view security camera footage.
World War II Museum Director of Security David Heidenthal was not at work the day of the burglary and learned of the burglary through a phone call from his acting supervisor. The burglary occurred in the central plant of the museum, where the air-conditioning, heating and power for the rest of the museum is housed. At the time, the adjacent Freedom Pavilion was being constructed, and the construction company performing the job used the central plant to store materials and as an office. The area was locked up and secure on Sunday, May 6,2012.
When he returned to work on May 7, 2012, Mr. Heidenthal viewed' the May 6, 2012 footage from the security cameras at the central plant. In one recording, he saw interior footage of a man walking in front of a camera overlooking a big garage door for the plant on Magazine Street, at approximately 8:00 a.m. on May 6, 2012. Mr. Heidenthal described the man as older and thin, with “longish” hair, and wearing a baseball cap and “light colored trousers.” Though he tried to | preserve this video as evidence, he was unable- to do so. Mr. Heidenthal wrote a statement immediately after he failed to preserve or download the 8:00 a.m. recording to document what he saw. In the statement, he described the perpetrator as-“an unidentified white male, slim build, long hair in a ponytail, about 150 pounds, wearing a tee shirt and ball cap.”
In the written statement, Mr. Heiden-thal also wrote that in footage from 8:00 a.m., May 6, 2012, he observed the man “walking East to West inside the first floor of the Central Piant.” He continued, writing, .
[a]t approximately 0810 on the recording, I observed; the same individual inside our Central Plant open the Magazine Street overhead door, pull out from inside one of our copper radiators onto the outside sidewalk, and then came back inside to close the overhead door. I also observed on recording at approximately 1000, 6 May, this same individual along with an. accomplice pull copper pipe from our construction site, under the fence, onto the side walk on Calliope Street, and carry the copper pipe down Calliope towards the river.
The second recording from . 10:00 a.m. was introduced and played for the jury. Mr. Heidenthal described the man who was depicted in both videos as:. “light collared trousers, greyish top and baseball hat,” As the second video was played at trial, he identified the man in front as the man from the 8:00 a.m. video. On cross examination, Mr. Heidenthal admitted that he, could not see facial features in the videos.
Mr. Heidenthal also identified pictures taken of a destroyed card swipe apparatus outside of the security office on the second floor of the central plant, among other pictures taken around the building.
Greg Lewis, vice president of Gallo Mechanical, a mechanical and plumbing contractor company, testified that part of his job includes knowing the value and pricing of copper piping. Mr. Lewis had twenty- *442 seven years of experience, which [4he opined, provided him with a working knowledge of the value of copper. His company was a subcontractor working on the Freedom Pavilion at the museum. They were installing plumbing and ah' conditioning systems.
Mr. Lewis testified that some copper piping, valves, and tools were stolen from his company in the May 6, 2012 burglary. When shown a picture of a courtyard next to the central plant with copper pipes strung and leaning against a wood fence, Mr. Lewis testified: that his company would not store copper piping in such a way. Rather, it would be stored in a secure location. Thus, Mr. Lewis concluded that the depicted piping was moved into the court yard. He opined from his experience in purchasing copper that the depicted copper was worth $4,000.[2]
Mr. Lewis was shown two photographs, which were introduced during Officer Trei-gle’s testimony. One photograph depicts, in pertinent part, a yellow bag containing several valves and a sawed-off piece of piping under the bag. The second photograph depicts copper tubes lying near the bag. Mr. Lewis recognized a control-valve in the bag as one that he purchased for the museum project, and he opined that it was worth approximately $250. He did hot know the value of the tubes in the second photograph because they were scrap, which he does not purchase or sell. However, he estimated that they would be worth approximately $300 new.
World War II Museum security officer Andrew Joseph Ledet stated that he arrived to work at approximately 7:45 a.m. on May 6, 2012. As he walked from his car to the central plant at the museum, he noticed the copper pipes sticking out | fiover the wooden fence on Magazine Street. When he went inside, other guards were already looking at surveillance footage, having discovered the burglary, and he began watching video surveillance in the control room inside the central plant. In addition to the Magazine Street side of the central plant, the videos depicted copper next to a fence on the Calliope Street side. A museum engineer called and informed the guards that he had heard somebody in the plant at approximately 8:00 a.m. A guard went to investigate and reported that some things were out of place. At that time, Gallo Mechanical was contacted. Mr. Heidenthal was called as well.
Mr. Ledet was . watching the cameras when he got up and put on a tie shortly before 11:00 am for a shift change, at which time he would be roaming the museum campus. He turned away from the screen. When he turned back around, the copper by the Calliope Street fence was gone. Immediate review of the footage showed two men pulling the copper under the fence. One carried a yellow bag, and the other carried copper piping on his shoulder. After taking the copper pipes, they walked toward the river. Mr. Ledet and a museum security supervisor, Duncan Quad, got in a van, drove up Magazine Street, and cut through a parking lot. Mr. Ledet thought that the burglars were either in the area, because they did not seem to have any transportation, or they were gone. A Crescent City Connection police officer was in the parking lot, but had seen nothing. At the other end of the parking lot, Mr. Ledet turned right onto Annunciation Street, at which time Mr. Quad exclaimed, There’s the • guy on the video. *443 They drove up to the man and informed him he wa,s under arrest. He wore shorts. Mr. Ledet asked Mr. Quad to watch the man in shorts. Mr. Ledet saw the man in long pants to his left, talking to a man on a pickup truck with a sign advertising cruise ship parking. Mr. Ledet walked over, detained .the man with long pants, and called the Ifipolice. Mr. Ledet identified the man he detained that had short pants as the man in the video carrying the pipes.
After the police arrived, Mr. ..Ledet spoke to the man with the cruise ship parking sign and learned that the two men he detained had “brought some pipe over,” and that it “was sitting up against the up ramp, down ramp.” Mr. Ledet and Mr. Quad went under the ramp and discovered pipes and a yellow bag containing valves. Mr. Ledet recognized these items in a photograph and stated that the yellow bag was the same one he had seen in the video.
Sometime later, Mr. Ledet and other guards reviewed more video and found footage of the man in shorts and a grey shirt inside the central plant building. At that point, the police were called. Mr. Ledet had no doubt that the man from the second video who wore shorts and carried the copper outside was the same man seen inside the central plant in the other video.
Duncan Andréw Quad, a security officer and floating supervisor at the'museum, stated that he arrived at work at 7:30 a.m. on. May 6, 2012. He observed the copper leaning against the fence on Magazine Street. When.he entered, he learned that maintenance staff member. Mario Mahea had reported that “things were not quite right down at the central plant, which is located next to where the pipe was located.”
At the time of the burglary, the Freedom Pavilion was under construction, and contractors used the central plant — which houses the heating and cooling facility and disseminates electricity throughout the museum — as a staging-.area. When he went to the central plant, Mr. Quad saw that a contractor’s box located on the second floor was opened and .“numerous tools [were] strewn about the place in | ^various odd locations.” Mr. Mahea also brought Mr. Quad’s attention to where a security entrance pad had been ripped off .the wall.
As a group of guards reviewed security camera footage; an individual was seen on the first'floor of the central plant at approximately 8:07 a.m. that morning. The person was a white male wearing a ball cap, gray shirt, and white or light colored pants. As noted previously, this video was lost;' On May 9, 2012, three days after the burglary, Mr. Quad wrote a statement of what he saw in this lost video. .He wrote:
On Sunday, May 6, 2012, I viewed the digital video recording of the-inside of the Museum’s Central Plant. At 0801 that date, I observed on the CCTV recording one unauthorized individual inside the Central Plant, first floor by the Magazine Overhead Doors [sic]. This individual was a white male, slim build, wearing a dark ball cap, -grey tee shirt, and white pants. At 0807, this same individual appeared] again in the camera, and appeared to be shifting material around. This same individual was observed again in the camera, and appeared to be shifting, material around. This same individual was observed again on CCTV at around 1000 that same morning as he and another individual were pulling copper pipe from the construction site under the fence onto Calliope Street. . ,
When the surviving video was played in court for Mr. Quad, he. identified the “one who’s closer to us” as the individual in the lost video, .and testified that the man “that’s closest to us appears to-be the gentleman seated at the defense table.”
*444 At the time of the shift change, Mr. Quad was in the control room and saw the same individual and another man on the monitor, pulling pipe under the Calliope Street fence and walk towards' the river. Mr. Quad and' Mr. Ledet got in a van and went to find the individuals they had just observed. Mr. Quad was afraid of the possibility that they had a vehicle in the area and would flee in it. They drove through the museum parking lot and turned onto Calliope Street towards the |sriver. No more than fifteen minutes after seeing the video of the Calliope Street fence, they encountered the same individuals. When they turned onto Annunciation Street, they saw the man wearing shorts at Annunciation and Calliope Streets.
Upon detaining the two men, “it was brought to [the guards’] attention that those individuals had placed the pipe in a particular location.” When they went to that location, they found the items seen stolen in the Calliope Street fence video— the pipe and the yellow bag. Mr. Quad identified a pipe piece in a photograph of the yellow bag that had been specifically designed for the job at the museum.

LAW AND ANALYSIS

In his first assignment of error, the defendant asserts that the evidence introduced at trial was insufficient to prove that he was the man depicted in the video depicting someone committing a burglary. Generally, when assessing the sufficiency of evidence to support a conviction, the reviewing court must determine whether, viewing the evidence in the light most favorable to the prosecution, a rational fact finder could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 309, 99 S.Ct. 2781, 2784, 61 L.Ed.2d 560 (1979); State v. Mack, 13-1311, pp. 8-9 (La.5/7/14), 144 So.3d 983, 988-89; State v. Barbain, 15-0404, p. 8 (La.App. 4 Cir. 11/4/15), 179 So.3d 770. This review must include the whole record, as a rational fact finder does. State v. Quinn, 12-0689, p. 10 (La.App. 4 Cir. 8/21/13), 123 So.3d 320, 326. If rational finders of fact cohld disagree as to the interpretation of the evidence, the rational trier’s view of all of the evidence most favorable to the prosecution must be adopted. Id. It is not the function of the appellate court to assess the credibility of witnesses or reweigh' the evidence. State v. Scott, 12-1603, p. 11 (La.App. 4 Cir. 12/23/13), 131 So.3d 501, 508 (citing State v. Johnson, 619 So.2d 1102, 1109 (La.App. 4 Cir.1993)). Credibility determinations, as well as the weight to be attributed to the evidence, are soundly within the province of the fact finder. Id. (citing State v. Brumfield, 93-2404, p. 5-6 (La.App. 4 Cir. 6/15/94), 639 So.2d 312, 316). Moreover, conflicting testimony as to factual matters is a question of weight of the evidence, not sufficiency. Id. (citing State v. Jones, 537 So.2d 1244, 1249 (La.App. 4 Cir.1989)). Credibility determinations are entitled to great weight and will not be disturbed unless contrary to the evidence. Id. “Absent internal contradiction or irreconcilable conflict with the physical evidence, a single witness’s testimony, if believed by the fact finder, is sufficient to support a factual conclusion.” State v. Marshall, 2004-3139, p. 9 (La.11/29/06), 943 So.2d 362, 369.
When the issue is identity of the défendant as the perpetrator, as opposed to whether a crime was committed, the State must negate any reasonable possibility of misidentification. State v, Haynes, 2013-0323, p. 8 (La.App. 4 Cir. 5/7/14), 144 So.3d 1083, 1088. In reviewing the fact finder’s determination, a reviewing court must examine the reliability of the identification according to the factors established in Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), which *445 are: “1) the opportunity of the witness to view the assailant at the time of the crime; 2) the witness’ degree of attention; 3) the accuracy of the witness’ prior description of the assailant; 4) the level of certainty demonstrated by .the witness; and 5) the length of time between the crime and the confrontation.” Haynes, 2013-0323, pp. 8-9, 144 So.3d at 1088.
The first, second, and third Manson factors address the crux of the defendant’s argument. The parties do not dispute that the video produced at trial hnfailed- to provide sufficient clarity'to identify faces. However, review of the second video shows that certain more general features were visible. Though the first video was destroyed, both Mr. Heid-enthal and Mr. Quad provided consistent accounts in their statements written only three days after the incident. Both observed a man inside the central plant. Mr. Heidenthal described this man as a “white male, slim build, long hair in a ponytail, about 150 pounds, wearing a tee shirt and a ball cap.” Mr. Quad described the burglar as “a white male, slim build, wearing a dark ball cap, grey tee shirt, and white pants.” Presumably, the clarity of the second video is representative of the .clarity of the first video. Thus, though the videos did not provide sufficient clarity for facial recognition, they provided sufficient clarity to show race, gender, build, and clothing. Mr. Heidenthal and, Mr. Quad had sufficient .opportunity to identify these characteristics. Their descriptions are also consistent with descriptions of one individual in the second video. The second video is in the record and depicts two men pulling copper under a fence. One man is wearing a dark t-shirt, dark pants, and a dark collared ball cap. Notably, he carries a yellow bag. The other man wears white shorts, a grey t-shirt, and a ball cap. This man in the white shirt bears the same description as the man Mr. Heidenthal and Mr. Quad identified in the first video. Thus, the evidence is sufficient to show that the man in the first video is the man wearing the white shorts, grey t-shirt, and ball cap in the second video. This conclusion is further supported by Mr. Ledet’s testimony that he was certain, per the fourth Manson factor, the man he saw in the first video was the man in shorts and carrying pipes in the second video.
After seeing the second video just minutes after it was shot, both Mr. Ledet and Mr. Quad pursued the men depicted therein. According to Mr. Heidenthal, Mr. InLedet, and Mr. Quad, the second video depicted -the two men walking down Calliope Street towards the river. As the guards drove down Magazine Street, they found the man wearing white shorts at the corner of Calliope and Annunciation Street. Finally,.addressing the fifth Manson 'factor, Mr. Quad testified that Defendant was detained no more than fifteen minutes .after he had seen him in the second video. Therefore, sufficient evidence exists to show .that Rainey was the man in both videos. His . gender, race, and clothing are the same as the man in the second video.
Adding to the certainty that the two men detained were the ones depicted in the second video, both Mr. Ledet and Mr. Quad learned from a man holding a cruise ship parking sign at the comer of Calliope and Annunciation Street that the other man and Rainey had placed pipes at a particular location under a ramp.' Consistent with this information, Mr. Ledet and Mr. Quad found pipes and a yellow bag under a nearby ramp. Notably, the second video shows Mr. Rainey’s accomplice carrying a yellow bag from the fence. Considering the totality of these facts, the jury could find beyond a reasonable doubt that Mr. Rainey was the man in the first *446 video committing the burglary of the .central plant. Defendant’s assignment of error is without merit.
In his second assignment of error, the defendant asserts that his theft of copper conviction should be set aside because it was not a crime on May 6, 2012. ■The State concedes that defendant’s assignment of error has merit, We agree.
In State v. Lodge, 2012-0733, pp. 4-5 (La.App. 4 Cir. 5/8/13), 116 So.3d 851, 855, this Court stated:
Art.’ I, 10 of the United States Constitution prohibits states from passing, and La. Const. Art. I, § 23 prohibits the enactment of, ex post facto laws. See also State ex rel. Olivieri v. State, 2000-0172, 2000-1767 (La.2/21/01), 779 So.2d 735, (analyzing both clauses). Under U.S. Const. Art. I, § 10, four categories of ex post facto laws have been outlined: 1) a law making criminal, and subject to punishment, an activity which Was innocent when originally done;- 2)- a law aggravating a crime or making it a greater crime than it was when originally committed; 3) a law aggravating a- crime’s punishment; and 4) a law altering the rules of evidence to require less or different testimony than was required at the time of the commission of the crime. Id. at 1767 p. 11, 779 So.2d at 742, citing Calder v. Bull, 3 U.S. 386, 390, 3 Dall. 386, 1 L.Ed. 648 (1798). The focus of a federal ex post facto inquiry is whether a legislative change “alters the definition of criminal conduct or increases the penalty by which a crime is punishable.” Olivieri, 2000-0172, 2000-1767, p. 14, 779 So.2d at 743. Accordingly, “the operative factor in determining whether a law falls within the ambit of the ex post facto clause is whether the law can be considered ‘punishment’ or altered the definition of criminal conduct.” Id. The Olivieri Court adopted the same analysis under La. Const. Art. I, § 23. Id. at 744.
The crime here occurred on May 6, 2012. The statute was not effective until August 1, 2012,- Acts 2012, No. 164 § 1, enacting La. R.S. 14:67.28 (theft of- copper). Accordingly, theft of copper was not a crime on May 6; 2012. Defendant’s conviction and sentence for theft of copper are vacated and set aside.
DECREE
■ Defendant’s conviction and sentence for simple burglary and the multiple offender adjudication finding him to be a second felony offender are affirmed. Defendant’s conviction and sentence for theft of copper are vacated and set aside.
CONVICTION AND SENTENCE FOR SIMPLE BURGLARY AFFIRMED;
CONVICTION AND SENTENCE FOR THEFT OF COPPER VACATED AND SET ASIDE.

. Mark Mason is not a party to this appeal.

. Mr. Lewis arrived at this number by noting that the picture depicted one inch copper, which is worth approximately $3 per foot, and three inch copper, which is worth approximately $12 per foot. He estimated that there were twenty links or four hundred feet of pipes in the picture. Thus, he arrived at an estimated value of $4,000.