STATE OF LOUISIANA       *      NO. 2023-KA-0498

VERSUS               *

                        COURT OF APPEAL

CRAIG L. CURLEY, SR.     *

                        FOURTH CIRCUIT

               *

                        STATE OF LOUISIANA

* * * * * * *

APPEAL FROM
CRIMINAL DISTRICT COURT ORLEANS PARISH
NO. 543-924, SECTION "F"
Honorable Robin D. Pittman, Judge
* * * * * *
**Judge Daniel L. Dysart**
* * * * * *

(Court composed of Judge Daniel L. Dysart, Judge Paula A. Brown, Judge Nakisha Ervin-Knott)

**BROWN, J., CONCURS WITH REASONS**
**ERVIN-KNOTT, CONCURS IN THE RESULT**

Jason Rogers Williams
District Attorney
Brad Scott
Chief of Appeals
Zachary M. Phillips
Assistant District Attorney
ORLEANS PARISH DISTRICT ATTORNEY'S OFFICE
619 S. White Street
New Orleans, LA 70119

      COUNSEL FOR STATE OF LOUISIANA/APPELLEE


Kevin Vincent Boshea
ATTORNEY AT LAW
2955 Ridgelake Drive, Suite 207
Metairie, LA 70002

      COUNSEL FOR DEFENDANT/APPELLANT

**CONVICTIONS AND SENTENCES AFFFIRMED**

**MARCH 18, 2024**

*DLD*

The defendant, Craig L. Curley, Sr., appeals his convictions and sentences for molestation of a juvenile under the age of thirteen pursuant to La. R.S. 14:81.2(D)(1), indecent behavior with a juvenile under the age of thirteen pursuant to La. R.S. 14:81(H)(2), and sexual battery of a victim under the age of thirteen pursuant to La. R.S. 14:43.1(C)(2). For the reasons that follow, we affirm the defendant's convictions and sentences.

**FACTS AND STAEMENT OF THE CASE**

On December 20, 2018, defendant, Craig L. Curley, Sr., was charged by a bill of information with the following: count one – molestation of a juvenile under the age of thirteen in violation of La. R.S. 14:81.2(D)(1); count two – indecent behavior with a juvenile under the age of thirteen in violation of La. R.S. 14:81(H)(2); and count three – sexual battery of a victim under the age of thirteen in violation of La. R.S. 14:43.1(C)(2). In all three instances, the juvenile involved was defendant's daughter. On January 14, 2019, defendant appeared for arraignment and pled not guilty to the charges. Trial by jury in Orleans Parish Criminal District court commenced on July 19, 2022.

In its case in chief, the State of Louisiana (the State) provided testimony and evidence concerning the investigation by the New Orleans Police Department (NOPD) into the allegations made against the defendant. NOPD Sergeant Nijel Baddoo testified that he was a supervisor in the child abuse unit. In January of 2018, Sergeant Baddoo became involved in the sexual assault investigation following the report of an incident on January 17, 2018. In connection with the investigation, Sergeant Baddoo met with the school counselor who first reported the abuse. The counselor identified the victim herein referred to as C.J. Sergeant Baddoo did not interview the victim as the counselor provided him with a letter from C.J. which he considered as her statement. Upon reporting the incident to his supervisor, Sergeant Baddoo learned that there had been a previous complaint involving the victim and defendant and that the investigation, dating back to 2016 was still open. After obtaining this information, Sergeant Baddoo spoke with defendant. Sergeant Baddoo advised defendant of his *Miranda* rights and defendant signed the *Miranda* Rights Waiver Form, reflecting that he was willing to speak with Sergeant Baddoo. In his statement defendant denied having any type of inappropriate sexual contact with the victim, his daughter. Also, during this interview defendant brought up the prior investigation, in August of 2016, involving his relationship with his daughter, C.J. Thereafter, defendant voluntarily provided Sergeant Baddoo with a buccal swab. Sergeant Baddoo explained that he took the buccal swab because the sexual assault kit from the 2016 case was untested.

Dr. Neha Mehta testified that she was the medical director of the Audrey Hepburn Care Center. Dr. Mehta was accepted, without objection, as an expert in child abuse specifically physical abuse, sexual abuse, and neglect.

Dr. Mehta testified that she examined C.J. after complaints concerning C.J. and defendant in 2016 and 2018. An audio recording of Dr. Mehta's 2016 examination of C.J. when she was ten years old, was introduced into evidence as state's exhibit 15 and published for the jury. Dr. Mehta testified that C.J. stated that "her father had pulled down her pants and underwear, [and] touched the skin of her private with his hand." C.J. also told Dr. Mehta that defendant touched her "'in the middle of her private' between the vaginal lips." Further, defendant took "her hand and placed it on top of his private on top of clothing." Dr. Mehta stated that C.J.'s physical examination was normal; however, explaining that such a finding was "consistent with a history of hands or fingers going between the vaginal lips." After speaking to and examining C.J. in 2016, Dr. Mehta concluded that C.J. had been the victim of child sexual abuse.

Dr. Mehta met with C.J. for the second time, on September 18, 2018, after the complaint concerning the assault of September 3, 2018. An audio recording of Dr. Mehta's 2018 examination was introduced into evidence as state's exhibit 17 and published for the jury. In her 2018 assessment of C.J., Dr. Mehta documented the following:

> [C.J.] is now twelve years old…. She'd been seen in the Emergency Department on September the 3rd for an acute medical evaluation including evidence collection. And she had provided a history of digital vaginal penetration by her father. … [S]he had been seen at our program twice before. Once by me two years prior in 2016 as well as

3

earlier the same year in February by another medical provider, Dr. Ann Troy of our Care Plan. And … at both of those visits … she had provided clear disclosure of sexual abuse by her father including digital vaginal penetration.

… Child Protection Law Enforcement had been notified and … despite that, the child's mother had continued to allow the father access to the child since the initial reporting. She again, on the date that I saw her[,] September the 18th of 2018, provided a clear and detail[ed] history of sexual abuse by her father which included vaginal digital penetration, … dry humping, and having to touch his penis over the clothing. And so, my diagnosis [was] … chronic child sexual abuse, as well as concerns about mom's protective capacity. Though this time the child did express that her mother believed her at this point, but I was concerned because of the past history.

As was the case in 2016, C.J.'s physical examination in 2018 was normal, but again Dr. Mehta testified that she would expect a normal exam despite the history of digital vaginal penetration.

On cross-examination, Dr. Mehta was questioned regarding notations made by a case manager pursuant to the case manager's discussion with C.J.'s mother after the September 3, 2018 assault. The notations reflected that the mother stated that C.J.'s cell phone was taken away because of inappropriate texts C.J. was receiving from "little boys." When the cell phone was confiscated, C.J. "cried herself to sleep that night." The mother reported that the following day, at school, C.J. told the school counselor that her father had "touched her." According to the case manager's report, the mother believed C.J. was lying because she was upset that she no longer had her cell phone.

On re-direct examination, Dr. Mehta was asked to review Dr. Troy's 2016 diagnosis of C.J. Dr. Mehta stated: "The diagnosis is chronic sexual abuse." She stated that Dr. Troy further noted that C.J.'s mother did not believe C.J. C.J.'s mother told Dr. Troy that "she would kill him [defendant] if he did it."

4

Additionally, Dr. Troy noted that the mother had "allowed dad back in home [and was] planning on marrying him."

Paul Berry testified that he was the forensic DNA technical leader of the DNA unit of [the] Louisiana State Police. Mr. Berry, without objection, was accepted as an expert in DNA analysis. Mr. Berry was questioned with respect to laboratory reports he issued in 2018, introduced into evidence as state's exhibits 19 and 20, which covered all the things that were taken from [C.J.], as well as [the] conclusion related to that." Mr. Berry tested a swab from C.J.'s perineum, the strip of skin between the vaginal and the anal area and the test showed that neither defendant nor someone from his male lineage could be excluded as potential contributors of the DNA in that area.

NOPD Detective Derrick Melder testified that in 2016, he was assigned to the sexual assault unit. He stated that he began his investigation into C.J.'s sexual assault allegations on August 28, 2016, when he received a telephone call that a child abuse detective was needed at Children's Hospital. When he arrived at the hospital, he received a brief synopsis from the officer on the scene, who informed him that the child had disclosed that she was touched by her father. After obtaining the information, Detective Melder spoke with the child's mother, Tabitha Jenkins, who told him that the child sent "a text message stating that she had been touched by her dad." After receiving the child's text message, Ms. Jenkins left work, went home, spoke with her daughter and then spoke with her daughter's father who denied having touched the child. The father further suggested that the mother take C.J. to the hospital so that there would be proof that he had not touched her. Ms. Jenkins brought her daughter to Children's Hospital where a DNA rape kit was performed by a SANE nurse. Once the kit was completed,

Detective Melder brought it to "the Evidence and Property Division" and from there, it was "sent out to the Louisiana State Police Crime Lab to be analyzed."

During the interview, Ms. Jenkins reported instances when her daughter had been untruthful. Detective Melder testified that Ms. Jenkins found "every reason to tell me why she believed her daughter was being untruthful." Detective Melder testified that on January 17, 2018, he received a telephone call advising him that there was another allegation of defendant inappropriately touching his daughter, C.J. Detective Melder stated that this allegation was consistent with what C.J. had stated back on August 28, 2016.

During the second investigation, a DNA sample was obtained from defendant and that sample was sent to the Louisiana State Crime Lab to be compared with the sexual assault kit obtained in 2016. As a result of the DNA examination performed by the Louisiana State Police Crime Lab, it was discovered that there was DNA found on the victim from the defendant.

Detective Melder testified that continuing his investigation, he obtained text messages from Ms. Jenkins. In one text message, which Ms. Jenkins sent to defendant, she inquired about C.J.'s claim that defendant had inappropriately touched her. In response, defendant sent a text stating "something to [the effect] of it's something about the way she looks at me and I couldn't help myself."

The State next called Ch.J., the half-brother of C.J. and the son of Tabitha Jenkins. Ch.J was living in the home with his mother, defendant, and C.J. when the alleged inappropriate touching took place. Ch.J. testified that he never witnessed any inappropriate interactions between C.J. and defendant; however, he called his mother and 911 after C.J. stated that defendant had touched her inappropriately following the incident in September of 2018. In an audio recording

of an interview with Ch.J., taken by NOPD investigators he stated that defendant admitted to him that he touched C.J.

Tabitha Jenkins testified that in 2016, C.J. reported the sexual abuse to school personnel, who, in turn, contacted her and she brought C.J. to Children's Hospital. She stated that she spoke with a police officer at the hospital, informing the officer that she was not sure whether C.J. was telling the truth. Thereafter, the Department of Children and Family Services contacted Ms. Jenkins, informing her that defendant had to move out of the home. However, approximately thirty days later, after receiving a letter from the Department of Children and Family Services that the case had been closed, defendant moved back into the home. Less than a year after defendant moved back into Ms. Jenkins's home, C.J. told her mother that defendant began touching her again. Once again, C.J. reported the abuse to her school and school personnel brought her to the hospital in January of 2018.

The third time it happened in September of 2018, Ch.J., called his mother and told her to come home because the defendant had touched C.J. again. Ms. Jenkins testified that while she was driving home, defendant called her and told her to "come home I messed up." Ms. Jenkins interpreted him "messing up," as meaning that he had "touched [C.J.] again."

Ms. Jenkins testified that she was so angry when she arrived home, that she removed a box cutter from her pocket and cut the defendant. She testified that she was angry "because I kept letting him back into our life [a]nd he kept hurting our child." Specifically, he kept "touching her."

Ms. Jenkins stated that she told Ch.J. to call the police and, at that point, defendant sought to leave. He stated: "[L]et me go, let me leave. I'll never come back. Well, we can end this like this. I'm going to go to jail. Just let me leave."

Ms. Jenkins, however, would not allow defendant to leave, stating: "You touched her again. And this time you can't say you didn't do it, because it happened today. So, I told him he had to stay in the house until the police [came.]" Ms. Jenkins explained that at this point, she knew defendant was guilty because "[h]e said it. He said he messed up. I messed up. Let me go. I'm [going] to jail if the police come."

Following the above testimony, the State introduced as state's exhibit 21, text messages exchanged between Ms. Jenkins and defendant after the September 2018 incident, which revealed the following:

DEFENDANT:

> I single handedly ruined our relationship because my little girl liked attention from me.

MS. JENKINS:

> She wanted her daddy to love her. She wanted to be daddy's little girl. Not his side piece.

DEFENDANT:

> I want you to always remember this. I am never [an] aggressive man towards any females still to this day. Don't get upset. [C.J.] would look at me different and … I couldn't stop myself….

On cross-examination, Ms. Jenkins admitted that at first, she was not sure C.J. was telling the truth when she accused defendant of sexual assault and she admitted that C.J. had lied about other matters in the past. She admitted that when she spoke to Detective Melder on August 28, 2016, she described C.J. as "coo-coo." She explained that she did not mean that C.J. was crazy, but rather, that she was "goofy."

On re-direct examination, Ms. Jenkins expressed regret at initially not being sure about whether C.J. was telling the truth. Ms. Jenkins testified:

I should have took [sic] her [at] face value when she said it the first time and then the second time. And I should have ended it then. But I didn't. Because she never lied. Her stories never changed. When you tell a lie your story change[s]. Multiple times. … Everything she had said from day one is the same thing she [is] saying to this day. … It never changed. Her story never changed.

Prior to C.J. taking the witness stand, the courtroom was cleared. C.J. offered testimony regarding the first time defendant touched her. She stated that it was while they were living in New Orleans East in a one-bedroom apartment. Defendant touched her vagina on top of her clothes. She told a girl at her school about the touching and the girl told school authorities who contacted her mother. However, when her mother came to school, she told her mother that she was lying because she did not think her mother would believe her. She explained that at that time in her life, "I had a bad habit of lying. … I used to lie about small petty stuff."

C.J. estimated that defendant inappropriately touched her more than twenty times but less than thirty. The second time she reported defendant sexually assaulting her, her mother brought her to the hospital. C.J. explained that she wrote a letter to the school counselor which stated:

My dad touches me in places I don't want to be touched. Last year he started this. We were living in an apartment, and I had a dress on. He asked me if I had on shorts, and I said yes. He said let me see, so, I showed him then he started touching me. He did that from January through July was when I said something. I had counselors come to my school, people after school and they said he couldn't live with us anymore but a month later, he came back. Now, he has been touching me from August to now, but I don't want to make my momma sad because they are getting married next March, and I don't want to see her hurt. I love her too much.

In addition to inappropriately touching her, C.J. stated that her father would "dry hump" her. Finally, in September of 2018, C.J., on the day the incident occurred, C.J. reported defendant's sexual assault. Defendant started touching her

9

and "[t]hat's when I called my brother." After touching her, defendant told her "to calm down" and not to "hurt the family."

C.J. testified that prior to the September incident, while she and defendant were alone in his car, "he started touching between my legs. I was moving his hand, but he kept putting it back."

C.J. stated that after almost every sexual assault, defendant would tell her to take a shower. C.J. explained that she obeyed defendant because she was young and did not realize why he was telling her to take a shower. However, she understood later that defendant wanted her to take a shower "to erase the evidence" of his sexual assaults.

C.J. testified that defendant "fingered" her all over the house and "[i]n cars and stuff." She explained that in the car, he would touch her over her clothes, but in the house, he would "finger" her under her clothes.

C.J. stated that the sexual assaults she endured at the hands of her father "messed her up" mentally. She explained: "I've been to four different mental hospitals, overdosing, trying to kill myself. He changed my perspective of life in general." In an audio-recorded interview, C.J. stated that with regard to the September, 2018 sexual assault, the defendant touched her on her "boutte," her "boobs," on her "cooch," and he tried to kiss her, but she kept moving. She stated that defendant came up to the front of her and started "dry humping me." After she escaped, he told her not to tell her mother about what happened because he would go to jail and "we're not going to have a family."

Following C.J.'s testimony, the State rested and the defense presented its case. The defense called George Schiro. Mr. Schiro testified that he was the lab director at Scales Biological Laboratory in Brandon, Mississippi. After discussing

10

his credentials, Mr. Schiro was accepted, without objection, as "an expert in DNA analysis, serology, [and] collection and preservation of evidence." Mr. Schiro testified, based upon his testing of the DNA provided to the DNA unit of the Louisiana State Police, that defendant and "all male individuals within his biological parental lineage" could "not be excluded as a donor of the partial … DNA profile attained from [C.J.'s] perineum swabs."

Lexus Johnson testified that she was defendant's daughter. She stated that defendant had "always been around since I was born" and she had often been alone with defendant. During that time, she stated that defendant never touched her, explaining that "[h]e's not that type of person."

On July 22, 2022, the jury returned unanimous verdicts of guilty on all three counts.

On August 31, 2022, defendant filed a motion for new trial, a motion for post-verdict judgment of acquittal, and a motion for downward departure. The trial court denied all three motions on September 14, 2022.

On October 19, 2022, the trial court sentenced defendant as follows: count one (molestation of a juvenile under the age of thirteen) – seventy-five years imprisonment at hard labor, with the first twenty-five years to be served without benefit of probation, parole, or suspension of sentence; count two (indecent behavior with a juvenile under the age of thirteen) – twenty-five years imprisonment at hard labor, to be served without benefit of probation, parole, or suspension of sentence; and count three (sexual battery on a victim under the age of thirteen) – seventy-five years imprisonment at hard labor, with the first twenty-five years to be served without benefit of probation, parole, or suspension of

11

sentence.  The trial court specified that the sentences imposed with respect to counts one through three were to run concurrently.

On November 9, 2022, defendant filed a motion to reconsider sentence.  The trial court denied defendant's motion to reconsider on March 16, 2023.

Following sentencing, defendant filed a motion for appeal which was granted.  Defendant's brief was filed in this Court on October 30, 2023, and the State's brief was filed on November 16, 2023.

**DISCUSSION**

On appeal, the defendant raises the following assignments of error: (1) the verdicts were contrary to the law and the evidence; (2) the district court erred in the denial of the motion for new trial; (3) the district court erred in the denial of the motion for a post-verdict judgment of acquittal; (4) the imposed sentences were unconstitutionally excessive, unduly harsh and unsupported by the evidence; (5) the district court erred in the denial of the motion to reconsider sentence and downward departure; (6) the defendant was convicted before an improperly constituted jury in violation of due process of law; (7) the defendant was denied a public trial; (8) the district court erred in allowing the use by the jury of prohibited written evidence during deliberations; and (9) the district court erred in the denial of the motion to suppress statement.

Our review of the record reveals no errors patent.  The defendant argues that there was insufficient evidence to support his convictions and, as such, the trial court erred in denying his motion for new trial and motion for post-verdict judgment of acquittal.  In support, defendant contends that C.J.'s three reports of sexual assaults correspond with the counts for which he was charged.  Specifically, defendant claims that the first report, following which C.J. told her mother that she

12

was lying, was insufficient to prove count one (molestation of a juvenile under the age of thirteen). With regard to the second report of sexual assault, defendant notes that C.J.'s recollection was not clear, pointing out that she could not "really remember what happened," and, as such, insufficient evidence was introduced to prove the elements of count two (indecent behavior with a juvenile under the age of thirteen). Finally, as to count three (sexual battery of a victim under the age of thirteen), defendant points solely to the testimony regarding the September, 2018 incident, claiming said evidence was insufficient to establish sexual battery.

The position taken by defendant that the individual counts he was convicted of apply specifically to the three official reports concerning C.J.'s abuse is misguided considering that the times C.J. reported the sexual assaults do not account for all the sexual assaults which occurred. C.J. described the incidents as more than twenty but less than thirty. Further, in assessing an insufficiency of evidence claim, an appellate court looks to the evidence in its entirety, then examines the elements of the offenses for which the defendant was convicted, and determines whether, viewing the evidence in a light most favorable to the prosecution, a rational fact finder could have found the defendant guilty beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 309, 99 S.Ct. 2781, 2784. 61 L.Ed.2d 560 (1979). This review must include the whole record, as a rational fact finder does. *State v. Gibson*, 2015-0682, p. 12 (La. App. 4 Cir. 1/27/16), 186 So.3d 772, 780.

In reviewing the whole record, "[i]t is not the function of the appellate court to assess the credibility of witnesses or reweigh the evidence." *State v. Barbain*, 2015-0404, p. 8 (La. App. 4 Cir. 11/4/15) 179 So.3d 770, 777 (quoting *State v. Richards*, 2011-0349, p. 9 (La. App. 4 Cir. 12/1/11), 78 So.3d 864, 869; *see also*

13

*Gibson*, 2015-0682, p. 13, 186 So.3d at 780. Credibility determinations, as well as the weight to be attributed to the evidence, are soundly within the province of the fact finder. *State v. Rainey*, 2015-0892, p. 9 (La. App. 4 Cir. 1/27/16), 189 So.3d 439, 444. "[C]onflicting testimony as to factual matters is a question of weight of the evidence, not sufficiency." *Id.* "Credibility determinations are entitled to great weight and will not be disturbed unless contrary to the evidence." *Id.* "In cases involving sexual offenses, the testimony of the victim alone may be sufficient to establish the elements of a sexual offense, even where the State does not introduce medical, scientific, or physical evidence to prove the commission of the offense." *State v. Barbain,* 2015-0404, p. 10, 179 So.3d at 778 (citing *State v. Reel,* 2010-1737, p. 8 (La. App. 4 Cir. 10/3/12), 126 So.3d 506); *see also State v. Williams,* 49,249, p. 7 (La. App. 2 Cir. 10/1/14), 149 So.3d 462, 468.

To support defendant's conviction on the charge of molestation of a juvenile under the age of thirteen, the State had to prove: (1) the commission of a lewd or lascivious act; (2) by a person over the age of seventeen; (3) upon a child under the age of thirteen; (4) where there is an age difference of greater than two years between the offender and the victim; (5) with the intent to arouse or gratify the sexual desires of either person; and (6) "by the use of force, violence, duress, menace, psychological intimidation, threat of great bodily harm, or by the use of influence by virtue of a position of control or supervision over the juvenile." La. R.S. 14:81.2(A); s*ee State v. Dillon,* 99-2175 (La. App. 4 Cir. 9/6/00), 770 So.2d 13.

The evidence adduced at trial, viewed in the light most favorable to the prosecution, showed that defendant committed lewd or lascivious acts with the intent to arouse or gratify his sexual desires. "Touching the victim's genitals

satisfies the elements of a lewd or lascivious act and the intent to gratify the offender's or the victim's sexual desires." *State v. Heath*, 53,559, p. 23 (La. App. 2 Cir. 11/10/20), 304 So.3d 1105, 1117 (citing *State v. Robinson*, 49,821, p. 9 (La. App. 2 Cir. 5/20/15), 166 So.3d 395, 400).  In this case, C.J. stated to Dr. Madta that defendant had pulled down her pants and underwear and touched her between her vaginal lips.  Further, C.J. testified that defendant, in the car, would touch her vagina over her clothes, but inside the house he would "finger" her under her clothes.

C.J., was under the age of thirteen.  As reflected by Dr. Madta's testimony, C.J. was ten years old when the sexual assaults were first documented and twelve years old when the last incident took place in September 2018.  Further, defendant was C.J.'s biological father and, as such, was clearly over the age of seventeen and there was an age difference of greater than two years between them.  He was in a position of control or supervision over the juvenile and had ample access to C.J. outside the presence of any witnesses.  Thus, all the elements necessary to prove molestation of a juvenile under the age of thirteen were present in this case.  Defendant's claim that there was insufficient evidence to support said conviction is without merit.

To sustain a conviction on the charge of indecent behavior with a juvenile under the age of thirteen, the evidence was required to show all of the elements necessary to sustain a conviction for molestation of a juvenile under the age of thirteen minus the requirement that the lewd or lascivious act must be performed by the use of influence by virtue of a position or control or supervision over the juvenile.  *See* La. R.S. 14:81(A)(1).  As set forth above, all of these required elements were established.  Accordingly, defendant's claim that there was

15

insufficient evidence to support his conviction on the charge of indecent behavior with a juvenile under the age of thirteen is without merit.

La. R.S. 14:43.1(A) defines sexual battery, in pertinent part, as follows:

[T]he intentional touching of the anus or genitals of the victim by the offender using any instrumentality or any part of the body of the offender, directly or through clothing, or the touching of the anus or genitals of the offender by the victim using any instrumentality or any part of the body of the victim, directly or through clothing, when any of the following occur:
(1) The offender acts without consent of the victim.
(2) The victim has not yet attained fifteen years of age and is at least three years younger than the offender.

As established above, the age requirements have been satisfied. The touching of C.J.'s genitals, as relayed to Dr. Mehta, took place when C.J. was ten to twelve years old and, as C.J. was defendant's biological daughter, he was clearly three years older than C.J. Further, C.J. told Dr. Mehta that defendant touched her genitals directly and also testified that defendant touched her vagina both over and under her clothing. *See State v. Lefleur,* 2021-347, p. 13 (La. App. 3 Cir. 3/30/22), 350 So.3d 562, 570, *writ denied,* 2022-00680 (La. 6/22/22), 339 So.3d 643; *State v. Bouton,* 615 So.2d 23, 25-26 (La. App. 3 Cir. 1993); *State v. Perkins,* 2011-162, p. 12 (La. App. 5 Cir. 12/28/11), 83 So.3d 250, 257; *State v. Ordonez,* 2016-619, p. 8 (La. App. 5 Cir. 3/15/17), 215 So.3d 473, 479; *State v. Lilly,* 2012-0008, p. 25 (La. App. 1 Cir. 9/21/12), 111 So.3d 45, 62, *writ denied,* 2012-2277 (La. 5/31/13), 118 So.3d 386. C.J. testified that she would move defendant's hand away, but "he kept putting it back." Additionally, C.J. continued to report the sexual assaults because they were happening against her consent; however, her mother did not believe her until the September 2018 assault, at which time, defendant was arrested. Defendant's claim that there was insufficient evidence to support his sexual battery conviction is without merit.

16

Defendant argues that his sentences were excessive and, as such, the trial court erred in denying his motions for reconsideration of sentence and a downward departure. In support, defendant asserts that the insufficiency of the evidence to support his convictions in conjunction with defendant's lack of any criminal history, shows that the sentences he received "are highly excessive."

Under both the Eighth Amendment of the United States Constitution and Article I, § 20 of the Louisiana Constitution, the imposition of excessive and cruel punishments are prohibited. *State v. Wilson*, 2014-1267, p. 23 (La. App. 4 Cir. 4/29/15), 165 So.3d 1150, 1165. "The excessiveness of a sentence is a question of law, and a reviewing court will not set aside a sentence [for excessiveness] absent a manifest abuse of discretion by the trial [judge]." *State v. Alridge,* 2017-0231, p. 39 (La. App. 4 Cir. 5/23/18), 249 So.3d 260, 288.

Although a sentence is within the statutory limits, the sentence may still violate a defendant's constitutional right against excessive punishment. *State v. Every*, 2009-0721, p. 7 (La. App. 4 Cir. 3/24/10), 35 So.3d 410, 417. "However, the penalties provided by the legislature reflect the degree to which the criminal conduct is an affront to society." *State v. Cassimere*, 2009-1075, p. 5 (La. App. 4 Cir. 3/17/10), 34 So. 3d 954, 958. "A sentence is unconstitutionally excessive if it makes no measurable contribution to acceptable goals of punishment, is nothing more than the purposeless imposition of pain and suffering, and is grossly out of proportion to the severity of the crime." *State v. Ambeau*, 2008-1191, p. 9 (La. App. 4 Cir. 2/11/09), 6 So. 3d 215, 221. A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice. *State v. Vargas-Alcerreca,* 2012-1070, p. 25 (La.

17

App. 4 Cir. 10/2/13), 126 So.3d 569, 583 (quoting *State v. Galindo*, 2006-1090, pp. 15-16 (La. App. 4 Cir. 10/3/07), 968 So.2d 1102, 1113).

A trial court "is afforded broad discretion in making sentencing decisions and an appellate court will not set aside an imposed sentence if the record supports the sentence imposed." *State v. Bradley*, 2018-0734, p. 8 (La. App. 4 Cir. 5/15/19), 272 So.3d 94, 99-100. Thus, "[t]he relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate." *State v. Mathieu*, 2018-964, p. 4 (La. App. 3 Cir. 11/6/19), 283 So.3d 1041, 1045.

In reviewing a claim that a sentence is excessive, an appellate court generally must determine whether the trial judge has adequately complied with statutory guidelines in La. C.Cr.P. art. 894.1 and whether the sentence is warranted under the facts established by the record. *State v. Wiltz*, 2008-1441, p. 10 (La. App. 4 Cir. 12/16/09) 28 So.3d 554, 561. However, even where there has not been full compliance with La. C.Cr.P. art. 894.1, resentencing is unnecessary where the record shows an adequate factual basis for the sentence imposed. *State v. Stukes*, 2008-1217, p. 25 (La. App. 4 Cir. 9/9/09), 19 So. 3d 1233, 1250 (quoting *State v. Major*, 96-1214, p. 10 (La. App. 4 Cir. 3/4/98), 708 So. 2d 813, 819). Further, La. C.Cr.P. art. 881.4(D) expressly states that an "appellate court shall not set aside a sentence for excessiveness if the record supports the sentence imposed."

The sentences imposed upon defendant all fell within the parameters of the sentencing statutes. For molestation of a juvenile under the age of thirteen, La. R.S. 14:81.2(D)(1) provides for a sentence of imprisonment at hard labor for not less that twenty-five years nor more than ninety-nine years with at least twenty-five years to be served without the benefit of probation, parole, or suspension of

18

sentence. The trial court sentenced defendant not to the maximum ninety-nine years imprisonment, but rather, to seventy-five years imprisonment at hard labor, with only the first twenty-five years to be served without benefit of probation, parole, or suspension of sentence.

For indecent behavior with a juvenile under the age of thirteen, the sentence shall be "imprisonment at hard labor for not less than two nor more than twenty-five years" with at least two years to be served without benefit of parole, probation, or suspension of sentence. La. R.S. 14:81(H)(2). The trial court sentenced defendant to the maximum sentence of twenty-five years at hard labor, to be served without benefit of probation, parole, or suspension of sentence.

For sexual battery of a victim under the age of thirteen, the sentence shall be "imprisonment at hard labor for not less than twenty-five years nor more than ninety-nine years" with at least twenty-five years to be served without benefit of parole, probation, or suspension of sentence. La. R.S. 14:43.1(C)(2). Once again, the trial court did not impose the maximum sentence. The trial court sentenced defendant to seventy-five years at hard labor, with the first twenty-five years to be served without benefit of probation, parole, or suspension of sentence. The court specified that all three sentences were to run concurrently.

The trial court, before imposing the above sentences, took into account the victim-impact statements provided by C.J, along with her mother. A review of C.J.'s statement reflects that while she may not have been physically injured as a result of defendant's numerous sexual assaults, she suffered mentally and emotionally. C.J. testified as to the emotional toll it has taken given that her father, someone who was supposed to protect her, would instead sexually abuse her. She stated: "I died on the inside because of you. [I] [c]ouldn't sleep, eat and barely

19

wanted to live. Going in and out of mental facilities … fighting for my peace. I'm not at peace, dad, and it's because of you." C.J. added that her conduct was affected as a result of the sexual abuse she endured at the hands of defendant. "I have tattoos on my body. I cut my hair off, I isolated myself from the world. I became distant from the people that I love most and started being disobedient towards my mom. I feel I should have that leeway … after going through this for three hard long years and waiting another three just to get the justice I deserve.

C.J.'s mother also spoke about the effect defendant's sexual abuse had caused, stating that C.J. "has been in the hospital three times since this happened to her." Further, she stated that the family was happy until defendant entered their lives; "I trusted you with the most important thing I have (my only daughter), and you tried to break her."

Another sentencing factor considered was defendant's lack of remorse. While defendant did not offer testimony at trial, at sentencing, he proclaimed his innocence, taking no responsibility for his crimes and offering no apology to C.J., his daughter, for the mental anguish his actions caused her to suffer. Defendant claimed that C.J. "fed lies" to the jury. He stated: "My daughter is an [sic] compulsive liar" and "Tabitha (the mother) is a worthless witness." He disparaged not only C.J. and Tabitha Jenkins, both of whom offered testimony against him, but also members of the family who did not testify, stating: "Three of the four people in her (Tabitha's) house have a criminal record, including Tabitha Jenkins. I've never even been in trouble for a violent crime, never for a violent crime. They have a violent history. They have the lying lips."

In sentencing defendant, the trial court provided:

And Section 21 [of Article 894.1(A)] says any other aggravating circumstance. Your lack of remorse, every word you said during this statement that you made to the court today, so when any higher court looks at this and wants to review whether or not I have an excessive sentence, I urged [sic] them to read the statement of Mr. Curley. Wherein he does not show any remorse, he does not take any blame and what occurred is the faults [sic] of everyone else but him. So that is a major aggravating factor.

In *State v. Brown,* 546 So.2d 1265 (La. App. 1 Cir. 1989), the defendant was a first-time felony offender and claimed that the sentence he received was excessive. On appeal, however, the First Circuit found the trial court balanced defendant's first felony offender status against his "total lack of remorse"; "defendant continued to deny any wrongdoing…." *Id.,* 546 So.2d at 1275. The trial court concluded that defendant's lack of remorse necessitated correctional treatment in a confined environment for an extended period and the appellate court found "no manifest abuse of discretion" with respect to the trial court's sentencing. *Id.*

Another factor the trial court considered before imposing its sentences was that defendant used his position of authority over his daughter to facilitate his sexual abuse. In *State v. Anderson,* 2012-869, p. 12 (La. App. 5 Cir. 6/27/13), 121 So.3d 119, 126, the Fifth Circuit noted that the jurisprudence reflects that maximum terms of imprisonment are not excessive when a defendant exploits his position of trust to abuse a juvenile. In this case, the court stated:

In addition, the offender used his position or status to facilitate the commission of the offense. You did. You used your status as her father. You knew exactly what you were doing, when you were doing it, for the four years that this took place.

*Here*, the trial court went into detail regarding the reasons for its sentences, including a discussion of the applicable La. C.Cr.P. art. 894.1 factors. The court provided:

21

So after having looked over the Code of Criminal Procedure Article 894.1, I agree with the state with what they began their argument with. Factors 1, 2 and 3. There is an undue risk that during the period of any suspended sentence or probation or parole this defendant would commit another crime in light of how this crime was perpetrated. I do believe that this defendant is in need of correctional treatment in some type of custodial environment that can only be most effectively provided by a commitment to some type of [penal] institution. And I think any lesser sentence would not even get him to appreciate the seriousness of his actions in this crime. Because as we heard today, he didn't do absolutely anything but try to provide for the family. It was everyone else's fault other than Mr. Curley's including blaming other children of his own.

Having looked at the remaining of the aggravating factors that the court wishes to consider and I'm going to go through them. One, the [offender's] conduct during the commission of this offense manifested a deliberate cruelty to the victim. Your daughter, [s]ir, will never be the same because of what you did. The offender knew or should have known that the victim of the offense was particularly vulnerable or incapable of resistance due to the extreme youth. You didn't even put that into consideration other than telling me she's a liar. Judge, she's a liar. Again, blame the victim. No one is at fault but other people.

\* \* \* \* \*

I'm also considering the duration of this offense. This wasn't a one-time situation. Four years of this girl's life, she had to endure this cruelty by her biological father.

In addition, the offense resulted in a significant permanent injury to the victim. She will never be the same. I don't care who it is. No one could be the same after going through four years of abuse by their biological father who is still denying it and blaming them.

Defendant argues that the imposed sentences were excessive because he had no criminal history. The trial court considered this as a mitigating factor, but dismissed its significance given the duration of the sexual abuse.

Defendant argues that the imposed sentences make no measurable contribution to acceptable goals of punishment and constitute nothing more than the purposeless imposition of pain and suffering and are grossly disproportionate to

the severity of his crimes. However, as reflected above, the young age of the victim and the significant period over which defendant committed the offenses played a substantial role in the trial court's sentencing. As the trial court noted, defendant's actions will have a lasting impact on his daughter; she will never be the same.

Further, as noted above, the trial court ordered that defendant's terms of imprisonment were to be served concurrently. Under the provisions of Louisiana Code of Criminal Procedure Article 883, concurrent terms of imprisonment are to be imposed "[i]f the defendant is convicted of two or more offenses based on the same act or transaction…." However, in a case such as this, in which defendant was convicted of three offenses based on numerous acts, specifically, numerous sexual assaults, Article 883 calls for the imposition of consecutive sentences "unless the court expressly directs that some or all of them be served concurrently." Thus, the court, in this instance, would have been justified in imposing consecutively-running sentences, but instead, specified that the sentences were to be served concurrently.

The trial court properly considered the Article 894.1 factors and did not abuse its discretion in sentencing defendant to concurrently-running sentences totaling an imprisonment term of seventy-five years with parole eligibility at twenty-five years. Defendant's excessive sentence claim is without merit.

Defendant contends that he was convicted before an improperly constituted jury in violation of La. C.Cr.P. art 401(A)(5), and, as such, the trial court erred in denying his motion for a new trial.

La. C.Cr.P. art. 401(A)(5) provides:

In order to qualify to serve as a juror, a person shall meet all of the following requirements:

23

5. Not be under indictment, incarcerated under an order of imprisonment, or on probation or parole for a felony offense within the five-year period immediately preceding the person's jury service.

In support of his claim, defendant cites *State v. Preston,* unpublished, 2023-0039 (La. App. 4 Cir. 1/19/23) (unpublished decision), a case in which the same claim was raised and the Court determined that an evidentiary hearing was required to assess the validity of Mr. Preston's claim. However, as this Court recently recognized in *State v. Scott,* 2023-0022, p. 10 (La. App. 4 Cir. 8/30/23), 372 So.3d 42, 58 and *State v. Bethley,* 2022-0849, p. 16 (La. App. 4 Cir. 6/21/23), 368 So.3d 1148, 1159, *Preston* was procedurally distinguishable from the cases presented in *Scott* and *Bethley* in that in *Preston*, the defendant timely filed a motion to quash the jury venire, something the defendants in *Scott* and *Bethley* failed to do. Likewise, in the instant matter, defendant failed during trial to lodge an objection regarding the improper jury venire composition. As such, as the Court concluded in *Scott,* 2023-0022, p. 10, 372 So.3d at 58 and *Bethley,* 2022-0849, p. 16, 368 So.3d at 1159-1160, defendant "is barred from raising the issue for the first time on appeal. *See* La. C.Cr.P. art. 841(A); *see also State v. Armentor*, 2019-1267, p. 12 (La. App. 1 Cir. 7/31/20), 309 So. 3d 762, 771-72. Accordingly, the instant claim for relief should be denied.

Defendant asserts that he was denied a public trial and, as such, the trial court erred in denying his motion for new trial. The State, prior to trial, filed a motion to have the trial closed not for the entirety of trial, but only when the juvenile victim, C.J., was testifying. Defendant filed a memorandum in opposition to the State's motion to take the minor victim's testimony in a closed session of court. The trial court, on July 7, 2022, granted the state's motion to take the minor

victim's testimony in a closed session and noted defendant's objection to the ruling.

> In a criminal case, the accused is afforded the right to enjoy a public trial by both the United States Constitution and the Louisiana Constitution. U.S. Const. amend. VI; La. Const. art. I, § 16. [However,] [t]he right to a public trial is not a "limitless imperative[,]" the right is subject to the trial judge's power to keep order in the courtroom or to prevent unnecessary pressures or embarrassment to a witness. *United States ex rel. Smallwood v. LaValle,* 377 F.Supp. 1148, 1151 (E.D.N.Y.), *aff'd.* 508 F.2d 837 (1974), *cert. denied,* 421 U.S. 920, 95 S.Ct. 1586, 43 L.Ed.2d 788 (1975).

*State v. Baumberger*, 2015-1056, pp. 29-30 (La. App. 3 Cir. 6/1/16), 200 So. 3d 817, 837.

> A trial judge may, in his sound discretion, exclude spectators from the courtroom while the testimony of a witness in a criminal case is being taken, if such a step is reasonably necessary to prevent embarrassment or emotional disturbance of that witness or to enable that witness to testify to facts material to the case. *State v. Poindexter,* [231 La. 630, 92 So.2d 390 (La. 1956)].

*State v. Canales,* 2016-272, p. 9 (La. App. 5 Cir. 12/7/16), 206 So.3d 458, 464.

In this case, the trial court did not abuse its discretion in excluding spectators from the courtroom while C.J. testified. She was still a minor, at the time of trial and the potential for her experiencing "emotional disturbance" if spectators had been present was evident. C.J. was being questioned about highly personal, embarrassing incidents. Thus, defendant's right to a public trial was not violated by virtue of the trial court's decision to have the minor victim testify during a closed session of court. This claim is without merit.

Defendant argues that the trial court erred in permitting the jury to review evidence during its deliberations. Pursuant to a written question from the jury during the course of deliberations, it was permitted to review, in open court, DNA

reports and two medical packets. Neither party objected to allowing the jurors to view the evidence.

La. C.Cr.P. art. 793(A) provides, in pertinent part, that a juror, during deliberations "shall not be permitted to refer to notes or to have access to any written evidence." The general rule is that a jury may not inspect written evidence in order to examine its verbal contents during deliberations. *State v. Freetime,* 303 So.2d 487, 490 (La. 1974). However, as reflected below, this Court has held that the prohibition enunciated in Article 793(A) may be waived if an objection based on the provisions of the article is not expressed.

In *State v. Freeman,* 2017-0417, pp. 12-13 (La. App. 4 Cir. 12/29/17), --- So.3d. ---, 2017 WL 6629156 at *6, the jury went to deliberate and subsequently sent a note requesting to view the nurse's report and the victim's transcribed audio statements. After conferring with the parties and neither side objecting, the "jury was brought down to the court room to view the documents." *Id.*, p. 13, 2017 WL 6629156 at *6. Based on defendant's failure to lodge an objection pursuant to Article 793, the *Freeman* Court concluded:

> The record before this Court suggests that defense counsel acquiesced in the presentation of the exhibits to the jurors…. [D]efense counsel's acquiescence to the jury review of the evidence and failure to object are tantamount to a waiver of La. C.Cr.P. art. 793 and therefore presents nothing for this Court to review. Accordingly, we find no merit to this assignment of error.

*Id.* (footnote omitted).

Similarly, in *State v. Augustine,* 2012-1759, p. 12 (La. App. 4 Cir. 9/18/13), 125 So.3d 1203, 1210, the jury, during deliberations, requested to review evidence admitted at trial, which included transcripts of jailhouse calls. Defense counsel only objected to the transcripts' admissibility but failed to lodge an objection

26

pursuant to La. C.Cr.P. art. 793. *Id.* In light of this failure, this Court, citing La. C.Cr.P. art. 841, held that the issue was not preserved for review because "an error cannot be availed of after verdict unless it was objected to at the time of the occurrence." *Id.* at p. 13, 125 So.3d at 1210-11.

In this case, defendant made no objection to the jurors reviewing the above-described evidence during deliberations. Accordingly, this claim is without merit.

Defendant argues that the trial court erred in denying his second motion to suppress statements as untimely without conducting a hearing on the matter. Though the recorded interview at issue, in which defendant was interviewed by Sergeant Nijel Baddoo, has not been provided to this Court, defendant represents that at the eighteen minute mark of the recorded interview, he asked if he could "get someone to represent me," thereby invoking his right to counsel. Defendant, however, makes no reference to any alleged inculpatory statement he made to Sergeant Baddoo which should have been suppressed since it was provided after he invoked his right to counsel. Instead, defendant argues that "the denial of a simple hearing by the [d]istrict [c]ourt is both an abuse of discretion and reversible error."

In this case, the original deadline for filing pre-trial motions was January 19, 2022. On May 25, 2022, the trial court granted defendant's request to extend the deadline until June 3, 2022. Between June 3, 2022 and July 19, 2022 (the first day of trial), there were no additional extensions requested or granted. The motion to suppress at issue was filed on July 18, 2022, one day before trial commenced and forty-five days after the discovery deadline. Thus, the trial judge did not abuse her discretion and authority to deny defendant's motion as untimely without conducting a hearing.

**CONCLUSION**

We find that the errors assigned by defendant regarding his convictions and sentences are meritless. Accordingly, his convictions and sentences are affirmed.

**CONVICTIONS AND SENTENCES AFFIRMED**